[Crim. No. 23649. Sept. 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID D. WEIDERT, Defendant and Appellant.

838

### Counsel

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, Eric J. Coffill and Steven W. Parnes, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Linda A. Cabatic, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

### Opinion

**BIRD, C. J.**—The principal issue presented by this case is whether an individual who intentionally kills a witness for the purpose of preventing his or her testimony in a *juvenile* proceeding is subject to the death penalty or life imprisonment without the possibility of parole under the 1978 Briggs Initiative.

### I.

On June 18, 1980, the office of Dr. David Joseph Edwards was burglarized. Dr. Edwards undertook his own investigation and focused upon the employees of the janitorial service he had engaged around the time of the burglary. The investigation prompted Michael Morganti to confess his involvement in the burglary. According to Morganti, he had acted as a lookout for appellant, then 17½ years old, who had been employed by the same janitorial service. Morganti subsequently pleaded guilty to petty theft based upon his involvement in the burglary.

Dr. Edwards' investigation led to several discussions about the burglary with appellant. On three separate occasions, Edwards informed appellant of his suspicions about appellant's involvement. On the last such occasion, Edwards told appellant that he knew that Morganti was an eyewitness to the

crime. According to Edwards, when appellant heard this, "the whole tenure [*sic*] of [the conversation] changed. [Appellant] became very angry; a stern voice, and he belted out—he says, 'listen,' he says, 'nobody is going to believe that idiot in Court. Nobody's going to believe him. I'll see to it that they don't.'"

In October of 1980, shortly after his 18th birthday, appellant told 17-year-old John A. that he had hired someone to kill Morganti but had not paid him. John responded that he knew someone who would commit the murder for appellant. Appellant also told another juvenile, Rodney G., of his intention to "get somebody" connected with the burglary.

About noon on November 21, 1980, John A. finished classes at his school in Fresno and headed for work. He had recently obtained a job through appellant in construction and in performing janitorial services. When his employer failed to meet him as agreed, John telephoned appellant, who told him that he had something very important to do that day and that it "would be worth more" to him if he waited to be picked up rather than going to work. John agreed to wait, and appellant soon arrived as arranged.

As they drove off in appellant's truck, appellant told John that he wanted to kill Morganti so that Morganti could not testify against him in connection with the burglary of Edwards' office. The pair drove to Morganti's neighborhood where they waited for several hours for Morganti. During the wait, appellant described to him the circumstances of the Edwards burglary and the extent of his and Morganti's participation.

Soon after this conversation, Morganti arrived on the scene and entered his apartment. Acting upon a ruse suggested by his girlfriend, John went to the apartment, introduced himself, told Morganti that his sister wanted to meet him, and convinced him to leave the apartment. They went to a parking lot where appellant was waiting. John and appellant then forced Morganti into the truck, drove about a mile, and then stopped to tie Morganti's hands behind his back. The trio then drove to an isolated location in the mountains where appellant, aided by John, beat Morganti and left him for dead in a shallow grave. Morganti died of suffocation.

Appellant was charged with kidnaping (Pen. Code, § 207)[1] and murder (§ 187). Two special circumstances were also alleged: (1) that the murder had occurred while defendant had been engaged in a kidnaping (§ 190.2, subd. (a)(17)(ii)), and (2) that the murder was committed to prevent Morganti from testifying in a criminal proceeding (§ 190.2, subd. (a)(10)).

---

[1]All statutory references are to the Penal Code unless otherwise stated.

Appellant moved to strike the second special circumstance allegation on the ground that no criminal proceeding had been pending in which the victim could have been a witness. He argued that there was not sufficient evidence "to indicate that the matter had developed to the point of [a] legal proceeding," and that in any event, since the burglary had been committed when appellant was a juvenile, Morganti could not have been a witness in a criminal proceeding. Appellant also demurred to the kidnaping-murder special circumstance on constitutional grounds. The trial court denied the motion to strike and overruled the demurrer.

A jury found appellant guilty of the charged offenses and found both special circumstance allegations true. Prior to sentencing, appellant unsuccessfully moved to strike the special circumstance findings. Thereafter, the court sentenced him to life imprisonment without the possibility of parole.[2]

## II.

The first issue this court must address is whether the kidnaping-murder special circumstance finding must be reversed.

This court recently held that where an accused's primary goal was not to kidnap but to kill, and where a kidnaping was merely incidental to a murder but not committed to advance an independent felonious purpose, a kidnaping-felony-murder special circumstance finding cannot be sustained. (*People* v. *Green* (1980) 27 Cal.3d 1, 47-62 [164 Cal.Rptr. 1, 609 P.2d 468]; see *People* v. *Thompson* (1980) 27 Cal.3d 303, 321-322 [165 Cal.Rptr. 289, 611 P.2d 883].)

The Attorney General concedes that the evidence was insufficient to establish that appellant committed the kidnaping to advance any felonious purpose independent of the killing. Appellant's avowed purpose was to kill Morganti in order to prevent him from testifying, not to kidnap him. Therefore, this special circumstance finding must be set aside and further proceedings on this allegation are barred by the double jeopardy clause. (*People* v. *Green, supra,* 27 Cal.3d at p. 62 and cases cited.)

## III.

The next issue is whether the jury's finding on the killing-of-a-witness special circumstance finding can be sustained. The resolution of this issue hinges in part on whether the voters, in enacting the 1978 Briggs Initiative, intended to subject an accused to the death penalty or a life-without-parole

---

[2]The prosecutor did not seek the death penalty.

term for intentionally killing a witness to prevent his testimony in a *juvenile* proceeding.

From a policy point of view, perhaps the killing of any witness—whether that witness' testimony was to be elicited in a proceeding denominated criminal, juvenile, traffic, "quasi-criminal," probate, civil, legislative, or administrative—should be a capital offense. ■ ■ ■ ■ However, our role is limited by the language of subdivision (a)(10) and any legislative history which elucidates its meaning.[3] ■ Both unequivocally indicate that only witnesses in *criminal* proceedings are covered by this provision.

The language of Penal Code section 190.2, subdivision (a)(10)[4] is clear and unambiguous. It subjects an individual to a sentence of death or life imprisonment without the possibility of parole if the victim "was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any *criminal* proceeding . . . ." (Italics added.)

■ "It is a settled principle in California law that '[w]hen statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it.' (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)" (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656].) This principle is but a recognition that courts " 'must follow the language used and give to it its plain meaning, whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature.' " (*Woodmansee* v. *Lowery* (1959) 167 Cal.App.2d 645, 652 [334 P.2d 991].) ■ Since the language of subdivision (a)(10) is clear, "its plain meaning should be followed." (*Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].)

Even if one looks beyond the plain words of the statute, there is no evidence that subdivision (a)(10) was intended to apply to witnesses in juvenile proceedings. If anything, the evolution of that provision in the years preceding its enactment supports the contrary conclusion.

The witness special circumstance provision was first enacted in the 1973 death penalty law. That provision required that "the murder [have been]

---

[3]As this court has recently observed, " '[i]f the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on [its] face . . . or from its legislative history.' " (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

[4]Hereafter all references to section 190.2, subdivision (a)(10) will appear as subdivision (a)(10).

willful, deliberate and premeditated and [that] the victim [have been] a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any *criminal* proceeding.'' (Former § 190.2, subd. (b)(2); Stats. 1973, ch. 719, § 5, p. 1299, italics added.) The 1977 version reenacted this language without change, but excluded from the statute's purview any killing that was ''committed during the commission or attempted commission of the crime to which [the victim] was a witness.'' (Former § 190.2, subd. (c)(2); Stats. 1977, ch. 316, § 9, p. 1258.)

The 1978 Briggs Initiative expanded the circumstances under which an accused would be eligible for a sentence of death or life without the possibility of parole. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 139-140 [197 Cal.Rptr. 79, 672 P.2d 862].) The initiative added several special circumstances to section 190.2 (see subds. (a)(8), (9), (11)-(16), (19)), expanded the list of felonies subject to the ''felony-murder'' special circumstance, and deleted the requirement that a felony murder be willful, deliberate, and premeditated. (Compare former § 190.2, subd. (c)(3) (Stats. 1977, ch. 316, § 9, p. 1257) with present § 190.2, subd. (a)(17).) For the most part, these additions broadened the class of persons subject to the most severe penalties known to our criminal law.

However, in marked contrast to this expansionist trend, the witness special circumstance continued to focus narrowly on *criminal* proceedings. Although the 1978 measure deleted the ''willful, deliberate, and premeditated'' requirement of the 1977 provision and extended it to killings ''in retaliation for [the victim's] testimony in any criminal proceeding,'' the ''criminal proceeding'' qualifying language was left untouched. There is no evidence that the people intended to adopt any broader a statute.

■ The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted. (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977-978, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].) This principle applies to legislation enacted by initiative. (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11 [210 Cal.Rptr. 631, 694 P.2d 744].)

■ For over 20 years, California law has provided that ''[a]n order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, *nor shall a proceeding in the juvenile court be deemed a criminal proceeding.*'' (Welf. & Inst. Code, § 203, ital-

ics added.)[5] The plain fact is that the electorate, deemed aware of section 203, enacted a provision which contains no language applicable to juvenile proceedings.

The 1976 reenactment of Welfare and Institutions Code section 203 (*ante,* fn. 5) also supports our conclusion. That reenactment came after a number of court decisions accorded juveniles many of the protections available to adult defendants.[6] Further, many other statutory provisions giving minors the same rights as adults were passed at the time of the reenactment.[7] This reaffirmation of the distinction between juvenile and criminal proceedings shows the clear intent of the Legislature. It cannot be ignored in interpreting subdivision (a)(10).

Over the past 15 years, several judicial decisions have acknowledged and expressly relied on the clear statement of legislative policy embodied in Welfare and Institutions Code section 203. (See, e.g., *In re Mitchell P.* (1978) 22 Cal.3d 946, 952-953 [151 Cal.Rptr. 330, 587 P.2d 1144]; *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 711, fn. 8 [135 Cal.Rptr. 392, 557 P.2d 976]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 439 [115 Cal.Rptr. 761, 525 P.2d 665].) Indeed, only recently did this court reaffirm the vitality of that statute when it held the certificate of probable cause procedure for criminal appeals inapplicable to juvenile appeals. (*In re Joseph B.* (1983) 34 Cal.3d 952, 955 [196 Cal.Rptr. 348, 671 P.2d 852].)

Where the language of a statute uses terms that have been judicially construed, " 'the presumption is almost irresistible' " that the terms have

---

[5]This statute was first enacted in 1915 as part of the Juvenile Court Law. (Stats. 1915, ch. 631, § 5, p. 1229.) It was then made part of the Welfare and Institutions Code (§ 736) when that code was enacted. (Stats. 1937, ch. 369, p. 1005 et seq.) The above italicized language was added by a 1961 amendment when the statute was renumbered as Welfare and Institutions Code section 503. (Stats. 1961, ch. 1616, § 2, p. 3460.) Finally, the statute was reenacted verbatim in 1976, and renumbered as section 203. (Stats. 1976, ch. 1068, § 1.5, p. 4741; *id.,* § 14, p. 4781.)

[6]See e.g., *Breed* v. *Jones* (1975) 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779]; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *In re Gary W.* (1971) 5 Cal.3d 296 [96 Cal.Rptr. 1, 486 P.2d 1201]; *T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767 [94 Cal.Rptr. 813, 484 P.2d 981]; *Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370 [93 Cal.Rptr. 752, 482 P.2d 664]; *Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797 [91 Cal.Rptr. 594, 478 P.2d 26]; *In re Gladys R.* (1970) 1 Cal.3d 855 [83 Cal.Rptr. 671, 464 P.2d 127].

[7]See, e.g., Welfare and Institutions Code sections 202, subdivision (a) (included among purposes of Juvenile Court Law is protection of public "from criminal conduct by minors"); 650, subdivision (b) and 681, subdivision (a) (requiring § 602 petitions to be filed by prosecuting attorney on behalf of People); 701 (applying criminal rules of evidence and standard of proof to § 602 proceedings); and 731 (limiting confinement time following a § 602 adjudication to period applicable to adult convicted of same offense).

been used "'in the precise and technical sense which had been placed upon them by the courts.'" (*In re Jeanice D.* (1980) 28 Cal.3d 210, 216 [168 Cal.Rptr. 455, 617 P.2d 1087]; *People* v. *Curtis* (1969) 70 Cal.2d 347, 355 [74 Cal.Rptr. 713, 450 P.2d 33]; accord *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].) This principle applies to legislation adopted through the initiative process. (*Jeanice D., supra,* 28 Cal.3d at p. 216.)

 Welfare and Institutions Code section 203 contains a clear directive that juvenile proceedings are *not* criminal proceedings. When subdivision (a)(10) was adopted, that directive had recently been judicially and legislatively reaffirmed. The failure to except subdivision (a)(10) from the umbrella of section 203 controls the resolution of the present case. (*Estate of McDill* (1975) 14 Cal.3d 831, 837-838 [122 Cal.Rptr. 754, 537 P.2d 874].)

The electors are also deemed to have been aware of provisions similar to subdivision (a)(10) whose application is not nearly so narrow. For example, section 137, which prohibits bribing a witness to influence his testimony, applies to "any witness." Section 136½, which prohibits bribing a witness to dissuade him from testifying, applies to "any witness" in "any trial or other judicial proceeding." Section 132 makes it unlawful to offer false evidence "upon any trial, proceeding, inquiry, or investigation whatever, authorized or permitted by law . . . ." Sections 133 (deceiving a witness), 134 (preparing false evidence), and 135 (destroying or concealing documentary evidence) have similarly broad applications.[8]

Subdivision (a)(10)'s qualifying language stands in marked contrast to these statutes. In enacting that provision, the voters approved language which, as Welfare and Institutions Code section 203 directs, cannot be interpreted to include juvenile proceedings. Whether the voters were wise in adopting it "is not for our determination; it is enough that they . . . made their intent clear." (*In re Lance W., supra,* 37 Cal.3d at p. 887; see also *In re Keith T.* (1984) 156 Cal.App.3d 983, 987 [203 Cal.Rptr. 112] ["[R]egardless of whether we may feel that section 243.4 [defining sexual battery] is too restrictive in its reach, it appears clear to us that our interpretation . . . is what the Legislature intended."].) This court is not free to disregard that vote, no matter how unwise we think the choice. (See *Vance* v. *Bradley* (1979) 440 U.S. 93, 97 [59 L.Ed.2d 171, 176, 99 S.Ct. 939].)

Recent actions in the Legislature concerning subdivision (a)(10) are noteworthy. During the last legislative session, two bills were introduced in the

---

[8]It is also noteworthy that in 1982, the Legislature made it unlawful to use or threaten to use force on a witness or crime victim or on any other person who has provided any assistance or information "to a public prosecutor in a criminal *or juvenile proceeding* . . . ." (§ 152, added by Stats. 1982, ch. 1100, § 1, p. 4001, italics added.)

Senate which would have broadened subdivision (a)(10) to include witnesses in juvenile court proceedings. Senate Bill No. 1203, introduced by Senator Ayala on March 4, 1983, would have amended that statute in relevant part to render an individual eligible for capital punishment if "the victim was a witness, victim or any other person who was intentionally killed . . . for providing assistance . . . to a public prosecutor in a criminal proceeding *or juvenile court proceeding.*" (Sen. Bill No. 1203 (1983-1984 Reg. Sess.) § 2, italics added.) Approximately one year later, on February 14, 1984, Senator Davis introduced Senate Bill No. 1827, which would have included juvenile court proceedings in subdivision (a)(10). (Sen. Bill No. 1827 (1983-1984 Reg. Sess.) § 3.[9]) Both bills passed the Senate, but died in the Assembly Committee on Public Safety. (Sen. Final History (1983-1984 Reg. Sess.) pp. 728, 1118.) Two bills introduced during the present legislative session also propose to amend subdivision (a)(10) to apply to witnesses in juvenile proceedings. (Sen. Bill No. 461; Assem. Bill No. 989 (1985-1986 Reg. Sess.).) The latter measure recently passed the Senate and is pending in the Assembly Committee on Public Safety. (Assem. Weekly Hist. (1985-1986 Reg. Sess.) Sept. 13, 1985, p. 572.) Although none of these actions can be deemed a clear expression of the scope of the present statute, they are worthy of mention.

The provisions of Proposition 8 confirm the conclusion that the voters did not intend to include juvenile proceedings within subdivision (a)(10). Proposition 8, passed four years after the 1978 Briggs Initiative, added a provision to the state Constitution which permits "[a]ny prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, [to] be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." (Cal. Const., art. I, § 28, subd. (f).) Whatever the meaning of this provision,[10] it is obvious that its drafters were

[9]The intent of the Davis bill can be gleaned in part from a Senate Judiciary Committee analysis. That analysis posed the question of whether subdivision (a)(10) should be "expanded to include juvenile proceedings," and frankly recognized that "[t]he purpose of the bill is to correct drafting defects in the Briggs Initiative." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1827 (1983-1984 Reg. Sess.) as amended Mar. 26, 1984, p. 2; see also *id.,* at p. 8 ["The change in [the Briggs Initiative] suggested by this bill covers only two of many drafting decisions which were arguably erroneous."].) The analysis noted the existence of the Court of Appeal opinion in this case and explained that the bill was intended to nullify its holding. (*Id.,* at p. 8.) While the analysis is, of course, not indicative of the entire Legislature's thinking, it does corroborate the view that the 1978 version of subdivision (a)(10) was not intended to be applied in any context other than a criminal proceeding.

[10]Thus far, the Courts of Appeal have upheld the dictate of Welfare and Institutions Code section 203 against the contention that Proposition 8 permits the use of juvenile adjudications for enhancement or impeachment. (See *People* v. *West* (1984) 154 Cal.App.3d 100, 108-111 [201 Cal.Rptr. 63] [construing § 28, subd. (f) to bar the use of juvenile adjudications for any purpose, but to permit the use of felony convictions for enhancement if the accused is an adult or juvenile being tried as an adult]; *In re Anthony R.* (1984) 154 Cal.App.3d 772, 775-776 [201 Cal.Rptr. 299] [holding a juvenile adjudication not a prior conviction for

careful to include juvenile proceedings within its scope. That degree of precision contrasts markedly with the absence of any such care in subdivision (a)(10). Further, it suggests that the witness special circumstance was intended to mean exactly what it says.

■ Even if we were to assume that the precise meaning of the "criminal proceeding" language of subdivision (a)(10) were somehow ambiguous, "the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstance of its application may reasonably permit" (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]; *People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186]) precludes application of the witness special circumstance to witnesses in juvenile proceedings.

This policy applies to enactments by initiative. (*Carlos* v. *Superior Court, supra,* 35 Cal.3d at p. 154.) It carries particular force here because subdivision (a)(10) establishes eligibility for the death penalty. This is an area in which the courts have recognized a heightened constitutional demand for certainty. (See, e.g., *Beck* v. *Alabama* (1980) 447 U.S. 625, 637-638 [65 L.Ed.2d 392, 403, 100 S.Ct. 2382].) Indeed, Professor Sutherland has noted that the degree of strictness in construing penal statutes should vary in direct relation to the severity of the penalty. (3 Sutherland, Statutory Construction (Sands rev. ed. 1974) § 59.03, p. 7.)

Strict construction of penal statutes has also been recognized as "a useful means to protect the individual against arbitrary discretion by officials and judges." (3 Sutherland, *op. cit. supra,* at p. 8.) The policy stated in *Keeler* and its progeny guards against the usurpation of the legislative function by the judiciary in the enforcement of a penalty where the legislative branch did not clearly prescribe one. (3 Sutherland, *op. cit. supra,* at p. 8.) This rule embodies a recognition that "since the state makes the laws, they should be most strongly construed against it." (*Ibid.,* fn. omitted.)

*McBoyle* v. *United States* (1931) 283 U.S. 25 [75 L.Ed. 816, 51 S.Ct. 340] illustrates the notice problem which would obtain by applying subdivision (a)(10) in this case. There, a federal statute punished the transportation of a stolen motor vehicle in interstate commerce. "Motor vehicle" included "an automobile, automobile truck, automobile wagon, motor

habitual criminal purposes under § 666].) Although section 28, subdivision (f)'s reference to juvenile proceedings has not yet been construed by this court, the lower courts' adherence to the mandate of Welfare and Institutions Code section 203 in the face of Proposition 8 supports the premise that that statute cannot be ignored unless clear and unambiguous language directs otherwise.

cycle, or any other self-propelled vehicle not designed for running on rails." (Former 18 U.S.C. § 408.) The court held that this statute did not apply to airplanes since "[a]irplanes were well known in 1919, when this statute was passed . . . ." (*McBoyle, supra,* 283 U.S. at p. 26 [75 L.Ed. at p. 818].)[11]

The reasoning of Justice Holmes' concluding paragraph is fully applicable: "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft, simply because it may seem to us that a similar policy applies, or upon the speculation that, if the legislature had thought of it, very likely broader words would have been used." (*McBoyle, supra,* 283 U.S. at p. 27 [75 L.Ed. at p. 818], citation omitted.)

As in *McBoyle,* even though an individual who kills a witness to prevent his testimony in a juvenile court proceeding may not reflect upon the scope of subdivision (a)(10) before acting, he or she is entitled to notice that such conduct is proscribed under that statute. It is true that the "policy" which renders capital the conduct described in subdivision (a)(10) could apply to a juvenile proceeding. However, the phrase "criminal proceeding" does not "evoke in the common mind" the picture of a minor facing a juvenile court petition, particularly in light of the Welfare and Institutions Code's direction that a juvenile proceeding is not a criminal proceeding. To draw any different line in this case would not "make the warning fair." (*McBoyle, supra,* 283 U.S. at p. 27 [75 L.Ed. at p. 818].)

■ Indeed, due process principles would be violated if this court held that subdivision (a)(10) could be applied in this case. *Keeler* v. *Superior Court, supra,* 2 Cal.3d at page 634, indicates why. ■ "Th[e] requirement of fair warning is reflected in the constitutional prohibition against the enactment of ex post facto laws (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 16 [now § 9]). When a new penal statute is applied retrospectively to make punishable an act which was not criminal at the time it was performed, the defendant has been given no advance notice consistent with due process."

---

[11]In 1948, Congress responded and amended the statute to prohibit the interstate transportation of stolen *aircraft* as well. (18 U.S.C. § 2312.)

Although by their terms, the ex post facto clauses apply only to legislative acts, both this court and the United States Supreme Court have incorporated the principle upon which the prohibition rests into the due process clauses of the state and federal Constitutions. (See *Marks* v. *United States* (1977) 430 U.S. 188, 191-192 [51 L.Ed.2d 260, 264-265, 97 S.Ct. 990]; *Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697]; *Keeler* v. *Superior Court, supra,* 2 Cal.3d at p. 634.) As this court stated in *Keeler,* the due process guarantee of fair notice is violated when "an act is made punishable under a preexisting statute . . . by means of an unforeseeable judicial enlargement thereof. [Citation.]" (*Ibid.*)

As Justice Mosk noted in *Keeler,* the application of the fair warning principle to judicial enlargement of penal statutes finds its roots in *Bouie* v. *City of Columbia, supra,* 378 U.S. 347. *Bouie* explained that "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law . . . . An *ex post facto* law has been defined by this Court as one . . . 'that *aggravates* a *crime,* or makes it *greater* than it was, when committed.' [Citation.] If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." (*Id.,* at pp. 353-354 [12 L.Ed.2d at pp. 899-900], citations omitted, italics in orig.)

The facts of *Keeler* illustrate these principles well. There, the accused had assaulted his former wife, who was pregnant by another man. The assault caused serious injury to her and resulted in the death of the unborn but viable fetus. At the time of the incident, the murder statute (§ 187) applied only to the unlawful killing of a "human being." The question presented was whether Keeler could be prosecuted for murder on the ground that the fetus was a "human being" within the meaning of section 187. (*Keeler, supra,* 2 Cal.3d at pp. 623-624.)

This court held that he could not. That conclusion was based on the origins and development of the common law of abortional homicide, the legislative history of the murder statute, and on the presumption that Keeler was entitled to the benefit of every reasonable doubt as to the meaning of the term "human being." (*Keeler, supra,* 2 Cal.3d at pp. 624-631.)

*Keeler* went on to address the due process-notice problem. On the date of the killing, there was "no reported decision of the California courts which should have given petitioner notice that the killing of an unborn but viable fetus was prohibited by section 187." (*Keeler, supra,* 2 Cal.3d at p. 636.) Since an unforeseeable *judicial* enlargement of the statute to include the

killing of a fetus would violate Keeler's due process rights, a prosecution for murder was barred. (*Id.,* at p. 639.)

*Keeler* readily acknowledged that petitioner's conduct "strongly implie[d]" violation of *another* criminal statute. "[T]here was another statute on the books which [he] could well have believed he was violating: [former] Penal Code section 274 [which] defines the crime of abortion . . . ." (*Keeler, supra,* 2 Cal.3d at pp. 635-636.) Even though Keeler's conduct did not involve "a constitutionally favored right," the court could not "den[y] that the guarantee of due process extends to violent as well as peaceful men." (*Id.,* at p. 635.)[12]

▬ This reasoning applies here. If this court were to judicially construe subdivision (a)(10) to include juvenile delinquency proceedings, such an "enlargement" would alter appellant's liability for Morganti's killing from first degree murder to murder with special circumstances. (See *Bouie* v. *City of Columbia, supra,* 378 U.S. at p. 353 [12 L.Ed.2d at pp. 899-900].) Such a construction would change "the legal consequences of [appellant's] acts completed before [the] effective date [of the construction]" (*Weaver* v. *Graham* (1981) 450 U.S. 24, 31 [67 L.Ed.2d 17, 24, 101 S.Ct. 960]) from a prison sentence of 25 years to life to life without the possibility of parole. (See *id.,* at pp. 30-31, 33-36 [67 L.Ed.2d at pp. 23-28]; *In re Stanworth* (1982) 33 Cal.3d 176, 180 [187 Cal.Rptr. 783, 654 P.2d 1311].)

This judicial enlargement of subdivision (a)(10) would not have been foreseeable. No reported decision placed appellant on notice that the intentional killing of a witness to prevent his testimony in a juvenile proceeding was prohibited by subdivision (a)(10), which speaks only of criminal proceedings. Therefore, application of that provision here would deny him due process. (See *Keeler, supra,* 2 Cal.3d at p. 639.) It is of little moment that appellant might have known that a killing of another human being could subject him to a prosecution for first degree murder. (See *id.,* at pp. 635-636.)

Finally, the Attorney General has urged that interpreting subdivision (a)(10) to exclude victim-witnesses in juvenile proceedings would "allow and encourage criminal offenders to literally get away with murder." Nothing could be further from the truth.

The intentional killing of a witness, whatever the context of his intended testimony, is hardly an act permitted by our law. To apply subdivision

[12]After *Keeler* was decided, the Legislature amended the definition of murder to include the unlawful killing of a fetus. (Stats. 1970, ch. 1311, § 1, p. 2440.)

(a)(10) as it is written in no way implies that appellant will escape his deservedly severe punishment. He remains validly convicted of first degree murder. As such, he faces a minimum prison sentence of 25 years to life. (§ 190.) Any suggestion that the failure to apply subdivision (a)(10) in this case would somehow permit appellant to profit from his own wrong is to evoke an emotional response and forfeit candor.

### IV.

At trial, appellant contended that the witness special circumstance finding should be stricken on the ground that there was no evidence that Morganti was intentionally killed for the purpose of preventing his testimony in a criminal proceeding, since the evidence at most established only that a juvenile proceeding had been contemplated.

Appellant's characterization of the evidence is a correct one. At the time of the burglary, appellant was 17½ years old. In view of his age and the offense involved, the only manner in which the case could have been prosecuted in a criminal court would have been for the prosecution to establish appellant's unfitness to be tried as a juvenile.

Welfare and Institutions Code section 707, subdivision (c) provides that a minor alleged to be a person described in section 602 for having allegedly violated certain enumerated crimes "shall be presumed to be not a fit and proper subject to be dealt with under the juvenile court law" unless the juvenile court concludes that he would be amenable thereto, based on certain criteria. Burglary is not one of the enumerated crimes. Therefore, even if the prosecutor had filed a petition in juvenile court alleging the burglary, he would have been required to make an affirmative showing of appellant's unfitness before the case could have been transferred to adult court.

However, it is far from probable that appellant's fitness to be tried under the Juvenile Court Law would even have been questioned. There is no indication that the prosecutor in that case ever considered seeking a finding of unfitness. When called as a witness in the present cases, he testified only that at the time of the killing, he had been contemplating filing a juvenile court petition. However, in accordance with the "early dispo" policy then in effect in Fresno County, he first offered appellant the opportunity to admit the offense on condition that it be declared a misdemeanor[13] and restitution

---

[13]Under the Juvenile Court Law, "[i]f the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, the court shall declare the offense to be a misdemeanor or felony." (Welf. & Inst. Code, § 702.) Burglary is one such offense. (See §§ 460, 461, 17.) The purpose of the required declaration is to facilitate a determination of the maximum theoretical period of the minor's potential confinement. (*In re Kenneth H.* (1983) 33 Cal.3d 616, 619, fn. 3 [189 Cal.Rptr. 867, 659 P.2d 1156].)

be made to the victim for half of his losses. (The other half was to be borne by a co-arrestee.) Although appellant rejected that proposal, the prosecutor's conclusion that the case warranted juvenile court treatment with a misdemeanor as a designation and restitution as a sanction strongly suggests that the case was not destined for a criminal court.

In addition, there is little evidence that appellant would have been found unfit for the juvenile court even if that question had been litigated. Such a showing would have required substantial evidence that appellant was not a fit and proper subject to be dealt with under the Juvenile Court Law. (*People v. Carl B.* (1979) 24 Cal.3d 212, 218 [155 Cal.Rptr. 189, 594 P.2d 14].) In making this determination, the juvenile court would have examined (1) the degree of criminal sophistication exhibited by appellant, (2) whether appellant could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, (3) appellant's previous delinquent history, (4) the success of previous attempts by the juvenile court to rehabilitate him, and (5) the circumstances and gravity of the alleged offense. (Welf. & Inst. Code, § 707, subd. (a); Cal. Rules of Court, rule 1348(b).)

According to the probation report, appellant had no record as a juvenile at the Fresno County Probation Department. FBI and CII records revealed no previous arrests or convictions as an adult. Although burglary is a serious crime, the manner in which it was allegedly committed here—by entering through a window which had been broken by throwing a rock—did not exhibit a high degree of sophistication. And, although the amount of money taken from Edwards' office was substantial ($700), there was no other damage, and no injuries were suffered.

Thus, appellant's argument regarding the absence of substantial evidence indicating a pending or future *criminal* proceeding at the time of the killing was a sound one. Nevertheless, this argument overlooks the fact that jury could have found the special circumstance allegation true if it found that appellant *believed* that his participation in the burglary subjected him to a criminal rather than a juvenile proceeding, and that he killed Morganti for the purpose of preventing him from testifying in such a proceeding.

■ The words of subdivision (a)(10) contemplate that it is an accused's subjective intent that is relevant in establishing a special circumstance finding under that statute. Subdivision (a)(10) renders a killing capital when the witness was intentionally killed "for the *purpose* of preventing his testimony in any criminal proceeding . . . ." (Italics added.) Thus, if an accused believes himself to be exposed to criminal prosecution and intentionally kills another to prevent that person from testifying in an anticipated or pending criminal proceeding, the special circumstance may be found true whether

or not an actual criminal proceeding was pending or about to be initiated. As the Court of Appeal here noted, "[t]he only relevance of an actual prior and ongoing criminal proceeding is that it may strengthen the inference of the existence of the prescribed purpose; conversely, the prosecution does not have the benefit of this inference when a criminal proceeding has not yet commenced."

A hypothetical or two may make it clear that it is an accused's subjective intent that is crucial under subdivision (a)(10). If an accused intentionally kills a would-be witness for the purpose of preventing him from testifying in an imminent criminal proceeding, it surely would be no defense to a subdivision (a)(10) allegation that, unbeknownst to the accused, the prosecutor had decided before the killing not to call the person as a witness at trial. Similarly, if the accused killed his accomplice for the purpose of preventing his testimony in a criminal proceeding, it should be no defense that at the time of the murder the prosecution had already decided to drop the case for lack of corroboration. (See § 1111.)

In this case, the jury was not instructed that in order to find the subdivision (a)(10) allegation true, it was necessary to find that appellant had killed Morganti for the purpose of preventing him from testifying in a criminal rather than a juvenile proceeding.[14] Accordingly, reversal of the special circumstance finding is required.

This does not mean that reprosecution on that allegation is barred. From the present record, it is not at all clear that the prosecution will be able to present sufficient evidence to create a jury issue with respect to the particularized intent required by subdivision (a)(10). However, because of the trial court's erroneous ruling that "juvenile proceedings" were included in the statute, the prosecution had no incentive to present evidence directed to that issue. Under these circumstances, the proper disposition is to reverse that special circumstance finding and remand the matter to the trial court. (See, e.g., *People* v. *Garcia* (1984) 36 Cal.3d 539, 557 & fn. 13 [205 Cal.Rptr. 265, 684 P.2d 826].)

---

[14]The dissent would take this issue from the jury and resolve it adversely to appellant, reasoning that "defendant was charged with knowledge that Morganti's testimony ultimately could have been elicited in an adult criminal proceeding." (*Post,* at p. 857.) On the present record, there is not the least bit of evidence from which to impute such knowledge to appellant. Certainly the fact that appellant "was *potentially* subject to adult criminal proceedings" (*ibid.*) provides no basis for doing so. This argument also ignores the fact that even if the record permitted such an inference, the absence of an *instruction* directing resolution of that question would compel reversal of the subdivision (a)(10) special circumstance allegation.

## V.

Appellant also contends that (1) his motion for mistrial should have been granted, based on a prosecution witness' reference to a polygraph examination of appellant, and (2) the prosecutor improperly commented upon appellant's failure to testify. These contentions were correctly resolved by the Court of Appeal when the case was before that court, and for the reasons stated by the Court of Appeal, this court holds each of them to be without merit. (See *People* v. *Javier A.* (1985) 38 Cal.3d 811, 815 [215 Cal.Rptr. 242, 700 P.2d 1244]; *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 252, fn. 16 [203 Cal.Rptr. 450, 681 P.2d 291].)

## VI.

Justice Traynor observed over a quarter-century ago that this court is " 'not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature.' " (*Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 130 [216 P.2d 825, 13 A.L.R.2d 252], quoting *Daniel* v. *Family Ins. Co.* (1949) 336 U.S. 220, 224 [93 L.Ed. 632, 637, 69 S.Ct. 550, 10 A.L.R.2d 945].) Those words are as true today as they were then.

There is no indication that the voters intended to make subdivision (a)(10) applicable to witnesses in juvenile proceedings. To alter that provision by judicial fiat would "deflect[] responsibility from those on whom in a democratic society it ultimately rests—the people." (*A. F. of L.* v. *American Sash Co.* (1949) 335 U.S. 538, 553 [93 L.Ed. 222, 231, 69 S.Ct. 258, 6 A.L.R.2d 481] (conc. opn. of Frankfurter, J.).) This court declines to take that unwarranted step.

The absence of substantial evidence that the killing was incidental to the kidnaping requires that the kidnaping-felony-murder special circumstance finding be set aside. Reprosecution of it is barred under double jeopardy principles. (*People* v. *Green, supra,* 27 Cal.3d at p. 62.) Since the trial court's instruction on the witness special circumstance did not comport with the construction of subdivision (a)(10) announced today, it too must be set aside. Should the state seek reprosecution on that allegation and the trier of fact find it true, the trial court should then consider whether the finding should be stricken in the interests of justice. (See *People* v. *Williams* (1981) 30 Cal.3d 470, 489-490 [179 Cal.Rptr. 443, 637 P.2d 1029].)

The judgment of guilt is affirmed. The special circumstance findings are reversed. The cause is remanded to the superior court for further proceedings consistent with this opinion.[15]

Kaus, J., Broussard, J., and Reynoso, J., concurred.

Grodin, J., concurred in the result.

**LUCAS, J.** Concurring and Dissenting.—I concur with the majority opinion to the extent it would strike the special circumstances finding under Penal Code section 190.2, subdivision (a)(17). I dissent, however, to reversing the separate special circumstances finding under subdivision (a)(10). In my view, the jury's finding that such special circumstance existed here should be upheld.

Subdivision (a)(10) applies to a murder committed to prevent testimony in a "criminal proceeding." The majority, in reversing the jury's finding under that subdivision, reasons that it would be inapplicable here if defendant murdered to prevent *juvenile* court testimony implicating him in a burglary. I suggest that such a result is intolerable—this defendant intended to kill, and brutally did kill, witness Morganti to prevent his future "court" testimony. Defendant should not be permitted to evade a special circumstance finding merely because the record is unclear whether he believed Morganti's testimony would have been elicited in a juvenile delinquency proceeding rather than adult court. Indeed, I find two independent grounds for sustaining the jury's finding under subdivision (a)(10).

### FACTS

In June 1980, Doctor David Edwards discovered that his office had been burglarized. Edwards suspected defendant, a 17½-year-old minor employed by Edwards' janitorial service. Edwards confronted and accused defendant on several occasions, finally informing him that defendant's coemployee Morganti was an eyewitness to the burglary. Defendant responded by saying "Nobody is going to believe that idiot in Court . . . . I'll see to it that they don't."

In November 1980, defendant approached another minor, John A., and told him that defendant wanted Morganti killed to prevent his testimony. Soon thereafter, John lured Morganti from his apartment and escorted him to a nearby parking lot where defendant joined them. Defendant pulled a

---

[15]In accordance with the parties' stipulation, the abstract of judgment should reflect the trial court's order staying judgment on the kidnaping conviction. (See § 654.)

knife from his pocket and ordered Morganti into defendant's truck. After stopping once to enable defendant to wire Morganti's hands behind his back, the trio drove to an isolated mountain area. Defendant grabbed his shovel and ordered Morganti to start digging. After the hole was dug, defendant made Morganti lie in it and, thereupon, began to strike him in the head with a baseball bat. Defendant passed the bat to John, who (at defendant's request) hit Morganti and then backed away. Defendant asked for John's knife and, as John turned away once more, he heard Morganti scream.

The assailants buried their victim in the shallow grave but, as defendant was walking across it, Morganti's hand emerged and grabbed defendant's leg. After Morganti's head emerged from the dirt, defendant wrapped a piece of wire around Morganti's neck and attempted to strangle him into submission. Finally, after Morganti's struggles ceased, defendant hit him in the groin area with the baseball bat and, observing no response, reburied him and left the area. The evidence indicated that Morganti died of suffocation. No formal proceedings with respect to the Edwards burglary had been initiated at the time of Morganti's death.

## DISCUSSION

Subdivision (a)(10) of section 190.2 provides that a special circumstance exists if "The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding . . . ." The majority concludes that defendant's killing of Morganti might not have been aimed at preventing testimony in a "criminal proceeding," because defendant was a minor when he committed the Edwards burglary and, accordingly, he would have faced only a juvenile delinquency hearing pursuant to section 602 of the Welfare and Institutions Code. The majority relies primarily upon the language of section 203 of the Welfare and Institutions Code that a wardship order "shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding." For two separate reasons, the majority's analysis is erroneous.

### 1. *Potential for Adult Proceedings*

First, as defendant was approximately 17½ years old at the time of the burglary, he was *potentially* subject to adult criminal proceedings in the event he was found unfit to be dealt with under the Juvenile Court Law. (See Welf. & Inst. Code, §§ 603, 604, 707; *Rucker v. Superior Court* (1977) 75 Cal.App.3d 197, 202 [141 Cal.Rptr. 900].) Thus, although the initial petition would have been filed in juvenile court, defendant was charged with knowledge that Morganti's testimony ultimately could have

been elicited in an adult criminal proceeding. Accordingly, it is entirely reasonable to hold that defendant's announced *general intention* to "see to it" that Morganti never testified "in Court" constituted substantial evidence of an intent to kill his victim to prevent his testimony "in any criminal proceeding." (§ 190.2, subd. (a)(10).)

It is true, of course, that we cannot know with certainty whether defendant's burglary case would have been tried in adult or juvenile court; key witness Morganti's death mooted the issue prior to the initiation of *any* proceedings. Yet defendant is hardly in a position to complain. Just as one accused of killing his parents cannot be heard to plead for mercy on the ground that he is an orphan, defendant's intentional murder of Morganti should estop him from complaining about any resultant uncertainty regarding the status of the burglary case.

### 2. *Juvenile Delinquency Proceedings Are "Criminal Proceedings"*

In any event, I think the majority's distinction between adult and juvenile proceedings in the present context is too artificial, producing anomalous results far beyond the probable contemplation of the framers of section 190.2, subdivision (a)(10). We must keep in mind that this provision was adopted by the people in November 1978 as part of an initiative measure designed to *expand* the list of special circumstances for which death or life imprisonment without parole may be imposed. (Ballot Pamp., Gen. Elec. (Nov. 7, 1978) p. 32.)

In construing initiative measures, we have indicated that they "must receive a liberal, practical commonsense construction which will meet changed conditions and the growing needs of the people. [Citations.] . . . *The literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers.* [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281], italics added.) In addition, as we have recently observed, when faced with serious constitutional questions involving the rationality of a death penalty statute, we should "endeavor to construe the statute in a manner which *avoids* any doubt concerning its validity. [Citations]" (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 147 [197 Cal.Rptr. 79, 672 P.2d 862], fn. omitted, italics in original.)

In my view, the only "practical commonsense construction" of the 1978 initiative provision at issue here, and the only interpretation which avoids an irrational, and possibly unconstitutional classification, is that the provision applies to all defendants who intentionally kill their victims to prevent

them from testifying in *any* proceeding aimed at establishing whether the defendant has committed a crime.[1] In this sense, a juvenile court delinquency hearing reasonably may be characterized as a "criminal proceeding." (See Welf. & Inst. Code, §§ 602, 707.) It would be anomalous to hold that the mere nature of the anticipated testimonial forum determines whether or not the case is a capital one. Intentional murder of a juvenile court witness is no less heinous or deserving of capital punishment than the slaying of his counterpart in adult court. Many cases have noted the practical equivalence of adult and juvenile court delinquency proceedings. (E.g., *In re Jerald C.* (1984) 36 Cal.3d 1, 8, and fn. 4 [201 Cal.Rptr. 342, 678 P.2d 917]; *In re Mikkelsen* (1964) 226 Cal.App.2d 467, 471 [38 Cal.Rptr. 106].) In addition to the "quasi-criminal" nature of juvenile court delinquency proceedings (*Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797, 801 [91 Cal.Rptr. 594, 478 P.2d 26]), and the "widely held belief" that they are "in reality criminal proceedings" (*In re Jerald C., supra,* 36 Cal.3d p. 8, fn. 4), it cannot be denied that both adult and juvenile proceedings are designed, at least in part, to protect the public from the consequences of criminal activity. (See *id.,* pp. 7-8; Cal. Const., art. I, § 28, subd. (a); Welf. & Inst. Code, § 202, subd. (b).) The intentional killing of a witness to prevent his testimony regarding the defendant's crimes poses identical threats to the public safety, and to the administration of justice, whether that testimony was to be elicited in adult or juvenile court.

For all the foregoing reasons, it is highly unlikely that the electors who adopted the 1978 death penalty initiative assumed that the phrase "criminal proceeding" would exclude a juvenile court delinquency proceeding based on acts constituting a crime if committed by an adult. Indeed, a more recent initiative measure which also involved criminal procedure and punishment employed the phrase "criminal proceeding" in its broader sense. The measure added article I, section 28, subdivision (f), to the state Constitution, providing that an accused's prior felony convictions "in any criminal proceeding, *whether adult or juvenile*" (italics added) shall be admissible at his trial. Thus, the words of our state Constitution presently confirm that "criminal proceedings" may, under certain circumstances, include juvenile court proceedings.

The majority relies heavily upon Welfare and Institutions Code section 203, which by its terms precludes a juvenile court proceeding from being deemed a criminal proceeding. Taken literally, and without considering the purposes underlying section 203, its language might limit the reach of the

---

[1]In this regard, the provision would not apply to other juvenile proceedings, such as truancy or disobedience proceedings not arising under section 602 of the Welfare and Institutions Code.

special circumstance provision at issue. Yet as we previously indicated, we may disregard the literal language of enactments to avoid absurd results and to fulfill the framers' apparent intent. Section 203 (formerly § 503) reflects one major purpose of the Juvenile Court Law, namely, to protect minors from "the stigma of criminality often attached to adult penal proceedings . . . ." (*T.N.G.* v. *Superior Court* (1971) 4 Cal.3d 767, 775 [94 Cal.Rptr. 813, 484 P.2d 981].) Yet no such stigma can possibly attach if we construe the special circumstance provision at issue as including juvenile delinquency proceedings. Indeed, the salutary purposes of the Juvenile Court Law would be promoted, not hampered, by holding that the murder of a witness in a juvenile delinquency proceeding is an aggravated crime which merits the most severe punishment.

The majority also relies upon the general rule that when a penal statute is *reasonably* susceptible of two interpretations, we *ordinarily* will adopt the one favorable to the defendant. (E.g., *People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186], and cases cited.) We have indicated that this general rule is founded upon the due process principle that a defendant is entitled to "fair warning" that his act is punishable as a crime. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

For two reasons, I reject application of this principle here. First, we have never indicated that the foregoing general rule must always override other interpretive principles such as the necessity to avoid absurd or anomalous results, or the obligation to construe statutes in such a manner as to uphold their constitutionality. Indeed, in *Davis, supra,* 29 Cal.3d 814, we cited and applied all of the foregoing interpretive principles in reaching our decision. As I have previously indicated, the adoption of defendant's proposed construction of section 190.2, subdivision (a)(10), would lead to anomalous, and perhaps unconstitutionally arbitrary, results. Accordingly, that construction should be rejected as one to which the provision is not "reasonably susceptible." (*Davis,* at p. 828.)

Second, defendant was not constitutionally entitled to know with absolute certainty that his brutal murder would invoke a "special circumstances" provision. Due process may require fair notice that one's conduct is punishable as a crime (*Keeler, supra,* 2 Cal.3d at p. 631), and defendant certainly must have realized that his actions were subject to severe punishment. Any imprecision in defining the *exact* nature or degree of that punishment should not be deemed constitutionally significant.

I would conclude that the second of the two special circumstance findings was supported by the evidence and should be sustained.

Mosk, J., concurred.