[No. F010939. Fifth Dist. Nov. 7, 1989.]

In re ALBERT B. et al., Persons Coming Under the Juvenile Court Law.
TULARE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v.

ALBERT B. et al., Defendants and Appellants.

COUNSEL

Nancy Marsh, Eleanor M. W. Youngsmith and Gregory M. Chappel, under appointments by the Court of Appeal, for Defendants and Appellants.

Lita O'Neill Blatner, County Counsel, Robert L. Felts and Teresa M. Saucedo, Deputy County Counsel, for Plaintiff and Respondent.

Ann Jory, under appointment by the Court of Appeal, for Minors.

OPINION

BEST, J.—

### STATEMENT OF THE CASE

On December 16, 1986, an amended petition was filed alleging that Albert B., and Rosemary B. came within Welfare and Institutions Code[1] section 300, subdivisions (a) and (d), and requesting that they be declared dependents of the juvenile court. Specifically, the petition alleged that the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

minors' home was an unfit place due to neglect because Rosemary was malnourished and suffering from "failure to thrive," both minors were extremely dirty and their parents had failed to provide the necessary medical care because Rosemary had severe cradle cap and severe diaper rash. Albert was born on May 17, 1985, and was 18 months old at the time. Rosemary was born on July 29, 1986, and was 5 months old at the time. Both minors were taken into custody.

On January 27, 1987, a contested jurisdictional hearing was held. The minors were represented by the district attorney. The court found the allegations in the petition to be true on counts I and II.

On March 3, 1987, a dispositional hearing was held. The minors were adjudged dependents and custody was taken from the parents and given to the department of social services.

On September 16, 1987, a semiannual review hearing was held. All attorneys agreed that increased visitation was in order. The court ordered some unsupervised visitation and overnights, conditioned on the house being clean to the satisfaction of the child protective services.

On October 19, 1987, a hearing was held to review the progress of the increased visitation. The attorneys entered into a stipulation increasing visitation on a slower schedule.

On December 15, 1987, a review hearing was held. At that point, no overnight visits had taken place. There was a divergence of opinions regarding the suitability of overnight visits. The court ordered one overnight visit, followed by a psychological evaluation. More overnight visits would be allowed if the evaluation recommended them.

On August 9, 1988, a contested hearing was held. The reunification plan was terminated. The court found that it would be detrimental to the children to be returned to their parents even if services were continued and that there was no likelihood of reunification and the plan for the minors was referral for adoption. Monthly visitation was ordered to be arranged and supervised at the discretion of the social worker.

## STATEMENT OF FACTS

Calvin Davis, a social worker for the Tulare County Child Protective Services, investigated the home of minors Albert and Rosemary on November 25, 1986. They were living in a former motel, which had been converted into apartments. Davis testified that he found Rosemary in an extremely

malnourished condition with a severe diaper rash and both children were dirty and extremely "odoriferous." Davis took them into custody because he felt that Rosemary was in imminent danger and that she appeared to be so severely malnourished as to be either failing to thrive or in actual danger of not surviving. The mother informed them that Rosemary had not seen a doctor since birth.

In the middle of December 1986, Dr. Mary McDonald, a licensed clinical psychologist, examined the two children. She described Albert as an unusual looking child because of a misshaped head that is flat on the left rear side. The doctor noted Albert had an unstable gait and did not walk as she would expect an 18 month old or a toddler to walk. The doctor further noted that no vocalizations or any type of verbalization was heard during the evaluation. Similarly, the foster mother had not heard any in the home. Also, when the child had been taken to see Dr. Cheney approximately 10 days earlier, it was also reported that no language had been heard.

While Albert would smile responsively in return to a smile, there was never any babbling at any time. During the evaluation, Albert behaved as if he had a mild hearing loss. However, the results of a hearing test indicated there was enough hearing that language could have been developed. When Albert was first seen, he had no affect, was disinterested, would stare blankly into space and was not interested in toys or objects.

Dr. McDonald concluded that Albert was developmentally delayed (i.e., "mentally retarded") from six or seven months to a year, depending on what developmental area was being considered. Albert was also significantly emotionally impaired. He had sleep problems, waking up every two hours during the night screaming. Albert was also depressed and needed environmental stimulation and nurturance. It was Dr. McDonald's opinion that the cause of the above was neglect and Albert not having had the appropriate experiences of social interaction. She admitted that she had not ruled out a birth defect as a possible cause of his slow development.

Rosemary was described as being on schedule developmentally several months after she had been taken into custody, but very emaciated when the doctor first observed her at four months of age. However, Rosemary was still at risk developmentally given the condition she was in when discovered. She was frequently irritable and needed to be held.

Dr. Cheney, a pediatrician, testified that she had examined Rosemary for the first time on November 25, 1986. Rosemary was emaciated and was, at eight pounds ten and one-half ounces, significantly below the fifth percentile for weight for her age. She had severe crusting on the scalp, like dermatitis,

which was probably dirt and oil because it washed off. Her abdomen was protuberant, her extremities were very thin with almost no subcutaneous tissue and she had extremely long and dirty fingernails. Rosemary whined most of the time, smiling only minimally. Dr. Cheney concluded that Rosemary was severely malnourished with signs of neglect.

When Dr. Cheney examined Rosemary again on November 28, 1986, she now weighed nine pounds, in spite of diarrhea. She was smiling more, starting to coo, did not whine or cry, her scalp was completely clear and her abdomen less protuberant.

Dr. Cheney treated Rosemary several times in December for fairly severe respiratory problems. She felt Rosemary had an allergic tendency and would continue to have difficulty with wheezing and needing medication, possibly hospitalization, whenever she gets a cold. At five months of age, the doctor thought Rosemary had a pretty good prognosis in terms of long term outcome. Yet, the doctor felt she was still at risk due to the severe malnutrition which may have interfered with the development of Rosemary's brain. However, it was too early to predict.

On November 26, 1986, Dr. Cheney examined Albert. He was slim, but adequately nourished. Albert was irritable, did not smile, laugh, coo, or use any language. His gait was unstable as though he had not been walking for very long. He appeared to be developmentally delayed and his emotional lack of social interaction suggested neglect.

Albert's head circumference was significantly below the fifth percentile. The left side of his head was very flattened, as if he spent most of the time on his back with his head turned. There was nothing in his birth records regarding this flattening. Rosemary also had a slight flattening, which the doctor assumed was from the same cause. While the doctor was unsure of the cause of the flattening of the head, she noted that if it becomes round as time goes by, then the cause was positional.

When Albert was examined again on December 8, 1986, he had become significantly more social. On December 16, 1986, the foster mother reported to Dr. Cheney that Albert was beginning to play patty cake and to finally smile.

Dr. Cheney's prognosis for Albert is very guarded due to the clear evidence of developmental delay. She was of the opinion that it is highly unlikely that Albert will ever develop normally.

Albert's father testified that his son had been born prematurely and was in the hospital three weeks. When his daughter Rosemary was born, she did

not have any problems. He blamed her emaciated condition on the fact that his wife mixed the formula incorrectly.

Both parents were tested by a clinical psychologist. He found the father to be of greater intelligence than the mother. With an I.Q. of 72, the father was at the borderline level of mental retardation, while the mother was placed at the highest level of mental retardation with an I.Q. of 64.

Throughout the proceedings, the parents were provided with various services to aid in reunification. Family care workers met with them to discuss parenting issues. They were requested to attend classes and partially complied. However, they continued to have problems with home sanitation. On an unannounced visit on May 29, 1988, the social worker found the apartment unacceptable. The beds and floor in the minors' room were covered with assorted clothing, shoes, suitcases and clutter; the bathroom was filthy, full of hair and piles of dirty clothing under the sink; the kitchen garbage was overflowing and debris covered the counter tops and under counter shelves. There was also an engine in the middle of the living room. A second unannounced visit revealed a similar situation, with inadequate food in the refrigerator and Rosemary in a dirty condition. Furthermore, the foster mother indicated the children returned hungry after overnight visits.

Overnight visits were attempted in the first half of 1988, but did not go well. Albert returned twice in March with head lice. The children were also found with various injuries immediately after the visits, such as a black eye and injury to the mouth, severe injury to Albert's penis, bruises, scratches and chipped teeth.

DISCUSSION

I

ARE ORDERS MADE AT THE PERMANENCY PLANNING HEARING REFERRING THE MINORS FOR ADOPTION AND CONTINUING OUT-OF-HOME PLACEMENT APPEALABLE?

Respondent (Department of Public Social Services) contends the instant appeal must be dismissed pursuant to section 366.25, subdivision (j), and *In re T.M.* (1988) 206 Cal.App.3d 314 [253 Cal.Rptr. 535]. Neither of the appellants adequately addresses the issue. Counsel for minors does address the issue, conceding that certain orders are no longer appealable, but contending the orders here are appealable as orders after a review hearing (relying on § 395). Minors' counsel further urges that if the orders herein

are not appealable, the instant appeal should be treated as an extraordinary writ as authorized by section 366.25, subdivision (j). (Also citing *People* v. *McMillan* (1971) 15 Cal.App.3d 576, 578-579 [93 Cal.Rptr. 296]; *People* v. *Santos* (1976) 60 Cal.App.3d 372, 378 [131 Cal.Rptr. 426].) Mother adopts by reference minors' argument on this issue in her reply brief.

Section 366.25, subdivisions (i) and (j), provide as follows: "(i) This section applies to minors adjudged dependent children of the juvenile court pursuant to subdivision (c) of Section 360 prior to January 1, 1989.

"(j) An order by the court that authorizes the filing of a petition to terminate parental rights pursuant to [Civil Code] Section 232 or that authorizes the initiation of guardianship proceedings is not an appealable order but may be the subject of review by extraordinary writ."

Regarding subdivision (j), the California Legislature's Assembly Office of Research, Assembly File Analysis 1987-1988, provides as follows: "This bill seeks to reduce litigation and add certainty by providing that an order authorizing the termination of parental rights or the initiation of guardianship proceedings is not an appealable order but may be the subject of review by extraordinary writ. Existing statutory law does not specify whether or not such orders are appealable and the various courts of appeal have been inconsistent in determining appealability of permanent plan orders which recommend that parental rights be terminated and require the county to file a complaint seeking termination of parental rights under Civil Code Section 232."

In *In re T.M., supra,* 206 Cal.App.3d 314, 315, the court held that pursuant to the above subdivisions, "any right to appeal from an order authorizing proceedings to terminate parental rights . . . has been retroactively terminated by the Legislature."

◼ The *In re T.M.* opinion did not consider the fact that subdivision (i) was added in 1987 and that subdivision (j) was added separately in 1988. It might be argued, therefore, that subdivision (j) was not intended to apply retroactively to cases before January 1, 1989. However, the Legislature is presumed to have been aware of the existence of subdivision (i) when it added subdivision (j). (*People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380].) Thus, we must assume the Legislature did intend subdivision (j) to apply retroactively, as the plain and ordinary meaning of the words used indicate.

◼ Minors' first contention is that the hearing at which the permanent plan calling for adoption was made was in fact a review hearing. As such,

minors conclude that the orders made are appealable as orders after a review hearing. Minors' sole authority in support of their conclusion is a citation to section 395. However, this is the same section originally relied upon in *In re Joshua S.* (1986) 186 Cal.App.3d 147, 151 [230 Cal.Rptr. 437], for the proposition that orders at the permanency planning hearing are appealable. Minors provide no basis for distinguishing the two hearings and to support the conclusion that orders after a review hearing are somehow exempt from the nonappealability provision of section 366.25, subdivision (j).

In any event, whether the orders here were made at a review hearing or a permanency planning hearing, the net result is the same—the appellants are appealing the court's order establishing adoption as the permanent plan. Because such an order is equivalent to an order authorizing the filing of a Civil Code section 232 petition (*In re Eli F.* (1989) 212 Cal.App.3d 228, 236 [260 Cal.Rptr. 453]), this case falls squarely within subdivision (j) of section 366.25. To permit the appeal here, which could technically be considered an appeal from a review rather than a permanency planning hearing (see fn. 2, *infra,* p. 374), would exalt form over substance and would fly directly in the face of what the Legislature obviously intended. Thus, we reject this contention. Moreover, we need not determine whether other orders made following a review hearing are appealable since that question is not before us.

However, minors and appellant father request that we consider this appeal as a petition for an extraordinary writ.

■ Numerous cases exist wherein the reviewing court has treated a defective appeal (i.e., one coming from a nonappealable order) as a petition for a writ. (See *Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 871, fn. 9 [196 Cal.Rptr. 69]; *People* v. *Gonter* (1981) 125 Cal.App.3d 333, 338 [178 Cal.Rptr. 66]; *Barnes* v. *Molino* (1980) 103 Cal.App.3d 46, 51 [162 Cal.Rptr. 786]; *People* v. *Cimarusti* (1978) 81 Cal.App.3d 314, 320 [146 Cal.Rptr. 421]; *Estate of Hearst* (1977) 67 Cal.App.3d 777, 781 [136 Cal.Rptr. 821]; *Branham* v. *State Farm Mut. Auto. Ins. Co.* (1975) 48 Cal.App.3d 27, 32 [121 Cal.Rptr. 304].) A stipulation or agreement by the parties is not a prerequisite to this court's exercise of its discretion to treat the appeal as a writ proceeding. (*People* v. *Cimarusti, supra,* at p. 320; see also *Rosack* v. *Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 750 [182 Cal.Rptr. 800]; *Daum* v. *Superior Court* (1964) 228 Cal.App.2d 283, 286 [39 Cal.Rptr. 443]; *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 111 [77 Cal.Rptr. 243, 453 P.2d 747]; *Brown* v. *Superior Court* (1971) 5 Cal.3d 509, 514-515 [96 Cal.Rptr. 584, 487 P.2d 1224].)

Where all the conditions necessary for issuing a writ of mandate are present, and a refusal to decide the issues raised by an improvident appeal

would result in unnecessarily dilatory and circuitous litigation, the court has the power to treat the appeal as a petition for writ of mandate. (*Olson* v. *Cory* (1983) 35 Cal.3d 390, 401 [197 Cal.Rptr. 843, 673 P.2d 720].)

█ All the conditions necessary for issuing a writ of mandate are present in this case. First, appellants have no plain, speedy and adequate remedy at law to review the trial court's orders. (Code Civ. Proc., § 1086.) They will be put to the undue burden, delay and expense of filing a petition for an extraordinary writ pursuant to section 366.25, subdivision (j). Matters involving child dependency are normally given expeditious treatment because time is of the essence in determining the best interests of the minor. Thus a delay in resolving the issues may have a detrimental impact on the minors.

Second, the records and briefs which have been submitted to this court in connection with the appeal include in substance the necessary elements of a petition for writ of mandate. In addition to the briefs submitted by the parties, the record on appeal consists of the clerk's transcript and the reporters' transcripts, all of which have been certified by the clerk, thereby providing the assurance of accuracy contemplated by the verification requirements of Code of Civil Procedure section 1086 and rule 56(a) of California Rules of Court. (*Olson* v. *Cory, supra,* 35 Cal.3d at p. 401 [rule 5.1(i), Cal. Rules of Court, is the functional equivalent of the verification required by Code Civ. Proc., § 1086 and rule 56(a)].) The fact that the trial court has not been joined as a party to the appeal does not defeat this court's jurisdiction to treat the appeal as a petition for a writ of mandate. (*Ibid.*; *People* v. *Cimarusti, supra,* 81 Cal.App.3d 314, 320.)

Finally, the circumstances of the instant case warrant the exercise of this court's power to treat the appeal as a petition for writ of mandate. From the start, the issue of appealability has been unclear, although this court has held the orders here are appealable. (*In re Joshua S., supra,* 186 Cal.App.3d 147.) Further, both appellants and respondent have thoroughly briefed the issues. Both these factors were considered persuasive to the Supreme Court in *Olson* v. *Cory, supra,* 35 Cal.3d 390, in deciding to treat an improvident appeal as a petition for writ of mandate. This case presents an unusual circumstance in that the right to appeal has been taken away retroactively. Furthermore, it would further the interests of judicial economy to treat the appeal as a petition for extraordinary relief. (*People* v. *McMillan, supra,* 15 Cal.App.3d 576, 578-579.)

## II

### DID THE COURT ERRONEOUSLY FAIL TO MAKE FINDINGS REGARDING ADOPTABILITY?

■ Parents, as well as minors, contend the court erroneously failed to make findings that the minors are adoptable before referring them for adoption. Respondent contends that while the court made no express finding of adoptability, none was required. Respondent further contends that an implied finding of adoptability was made.

Section 366.25, subdivision (d)(1), requires findings of adoptability to be made at permanency planning hearings before the court may authorize the petitioner to initiate proceedings under Civil Code section 232 for termination of parental rights. These findings, however, need not always be express. (*In re Venita L.* (1987) 191 Cal.App.3d 1229, 1239 [236 Cal.Rptr. 859].) Nonetheless, contrary to respondent's contention, we cannot infer from the trial court's order in this case that the court impliedly made the required findings. First, the social worker's report did not state the minors were adoptable.[2] Second, no evidence was submitted on this issue. Finally, the issue was not even raised.

In *In re Venita L., supra,* 191 Cal.App.3d 1229, this court held on a similarly deficient record from a permanency planning hearing that it could not assume or imply the required findings. Thus, it reversed the orders and remanded the case.

The error here could affect substantial rights of the parents and minors. If the minors are not adoptable and the parental rights are terminated, the minors could be relegated to a limbo of foster homes and/or institutions. (*In re Elise K.* (1982) 33 Cal.3d 138, 147-149 [187 Cal.Rptr. 483, 654 P.2d 253], Bird, C. J., conc.) In this case, the parties all agree that the parents love the minors. Thus, the termination of their rights might cut the minors off from the only permanent source of love available to them on a long-term basis.

Furthermore, given the background of these minors—poor infant care and uncertain medical prognosis—their adoptability is certainly an issue. If the minors are indeed not adoptable, then a guardianship or long-term

---

[2] As pointed out in minors' brief, the August 1988 hearing was originally scheduled to be a six-month review hearing and not a permanency planning hearing. However, there were a number of continuances to the point that the time limit for reunification services ran out. Although not explained by the record, the hearing was eventually treated as a permanency planning hearing.

foster care, where they might have supervised contact with their parents as is warranted, might be more appropriate than a termination of parental rights. This is the step contemplated for unadoptable children in section 366.25, subdivision (d)(2).

### III

### DOES SUBSTANTIAL EVIDENCE SUPPORT THE FINDINGS THAT REUNIFICATION SHOULD BE TERMINATED AND THAT OUT-OF-HOME PLACEMENT CONTINUE?

Parents contend there is insufficient evidence to support the findings of the court that reunification be terminated and that out-of-home placement continue. Not so.

Findings made at a juvenile dependency hearing where the minors are placed out of the home of a parent must be supported by clear and convincing evidence. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1114 [200 Cal.Rptr. 789].) However, on review, this court only determines whether, viewed in the light most favorable to the judgment, there is substantial evidence to support the findings of the juvenile court. (*In re Stanley F.* (1978) 86 Cal.App.3d 568, 575 [152 Cal.Rptr. 5].) All conflicts must be resolved in favor of the respondent and the reviewing court must indulge in all reasonable inferences to support the findings of the juvenile court. Where there is more than one inference which can reasonably be deduced from the facts, this court is without power to substitute its deductions for those of the trier of fact, and the findings of the juvenile court will not be disturbed on appeal where there is substantial evidence to support them. (*In re Nicole B.* (1979) 93 Cal.App.3d 874, 879 [155 Cal.Rptr. 916].)

In this case, the evidence of parental ineffectiveness and/or neglect on which the petition was founded and on which the court took jurisdiction was as follows: Five-month-old Rosemary was "so extremely emaciated that her survival appeared questionable. She resembled a child just out of a war concentration camp or an area of famine." Both minors were extremely dirty. Parents had not provided medical care to Rosemary for her severe cradle cap and severe diaper rash or for her immunizations. Albert was developmentally delayed, significantly emotionally impaired, had sleeping problems, was depressed and lacked environmental stimulation and nurturance and social interaction. Thus, the evidence pointed to a pattern of parental ineffectiveness and/or neglect. Originally the court expressed special concern over the general lack of parental skills. Throughout the entire proceedings, the court never found intentional neglect nor lack of love.

Instead, the problem was a persistent lack of ability to provide effective parental care.

Parents' contention that by the August 9, 1988, hearing they had corrected the conditions which originally had led to the petition is not supported by the record. While it is true that parents substantially complied with the reunification plan, their inability to provide effective parental care was never corrected. This became more evident as the case progressed. The court thus found that the parents' lack of ability had not been corrected in spite of all efforts made by local resources, stating as follows: "THE COURT: The history of this matter, in my opinion, demonstrates that by reason of the congenital mental condition of these two parents and the development of these two children Albert and Rosemary would be impaired in their care. That's clear to me.

"It's further clear that there would be a high risk of physical and emotional harm to these children if they were placed in the care of these two parents. This is regardless of whether there were continued reunification services provided. And this is regardless of the efforts on the part of these two parents to comply with the reunification."

The social worker's report filed on December 11, 1987, one year after the original jurisdiction, concluded that there was very little progress despite many home calls and services given by the family care worker. "These parents are of such limited intelligence it is really questionable if they can or able [sic] to grasp and utilize the services that have been offered and that are available to them." Serious questions remain regarding home cleanliness.

The report filed on June 21, 1988, described the problems with visitation. In the first four and one-half months of 1988, there had been seven overnight visits with Albert, Rosemary being included on five of these. There had also been six all-day home visits with both minors. After five of the visits, the children had unexplained bruises, scratches and chipped teeth. Family care workers advised the family on a weekly basis during most of this period. When family workers could not monitor them regularly, the home became unacceptably filthy. The children also appeared hungry after visitations. Apparently the newborn, Jennifer, was being cared for adequately, but the public health nurse visited weekly to check on her.

The social worker's report concluded that the parents had been offered sufficient services to improve their parenting skills to a satisfactory level. Nevertheless, the parents did not appear capable of independently caring for the minors. Therefore, the report recommended that the court proceed to permanency planning to provide for a stable future for the children.

The foster mother stated that the minors had made great progress, but had regressed in the spring of 1988 due to the extended visitation. The minors' mother (Mother) would express great concern when Albert was ill, but little concern when Rosemary was ill. The parents brought gifts for Albert, but not for Rosemary.

Licensed psychologist, Dr. Dan Yergensen, evaluated the parents and reported that the father had a good bonding with both his children and interacted appropriately with them. However, he had a poor understanding of parenting skills and would need ongoing support during the minors' childhood. The doctor did not believe classes would be sufficient due to the father's mild mental retardation. Mother also has mild mental retardation and lacks basic abilities to comprehend socially acceptable behavior. Mother is close to her son Albert, but ignores her daughter Rosemary. The doctor reported that the minors' original developmental delays had been completely ameliorated while in foster care. He found that the parents' limited intellectual abilities were the cause of the problems herein and that although they had made progress, they would require ongoing support on a weekly basis to care for their children. The doctor felt that even if the minors themselves were to have normal intelligence, they would be impaired in their ability to fully develop under these circumstances.

Dr. Cheney had treated Albert the day after a weekend home visit because of an injury to his penis. This visit had occurred about a week prior to the August 1988 hearing. Dr. Cheney observed a red crusted mark encircling at least one-half of the circumference of the base of the penis. The child told her his parents had placed a rubber band around the end of his penis. This could have resulted in the loss of the penis. Dr. Cheney had also seen Albert on August 8, 1988, because he would not eat. At that time, he had a black eye and an injury to his mouth. This was also following a weekend home visit.

Dr. Cheney was also concerned about Rosemary. Because of her asthma she could not be exposed to cigarette smoke. The parents had been warned that smoking was dangerous to her, yet she was often returned to the foster parents smelling of smoke. Dr. Cheney herself had smelled it.

■ While parenting is a fundamental right (*In re Carmeleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]), minors also have rights. As such, parenting rights are not absolute. The interest of parents in maintaining their relationship with their children must be balanced with the interests of the child in secure and sufficient parenting. (*In re Angelia P.* (1981) 28 Cal.3d 908, 916-917 [171 Cal.Rptr. 637, 623 P.2d 198].) Children

have a right to care which does not constantly endanger their physical well-being.

■ In short, the conditions which caused the original dependency have not been, and are not likely to be, corrected. Furthermore, reunification services are not required where parents have mental disabilities such that they would be unlikely to benefit from services to the point where they could adequately care for their child within 12 months. (§ 361.5.) Thus, there was substantial evidence to support the juvenile court's conclusions.

Parents also contend that because the reunification plan required them to demonstrate they could adequately care for their newborn, Jennifer, and they so demonstrated, they therefore proved they would be adequate parents for Albert and Rosemary. It must be pointed out, however, that this requirement was only one of many in the plan. Moreover, throughout the time they were caring for Jennifer, they were constantly monitored by the home visiting nurse. The decision in the instant case must focus on the parents' ability to care for Albert and Rosemary, not merely on their care for Jennifer. Here, Mother's behavior indicates she favors Albert and ignores Rosemary. Thus, evidence suggests she is likely to care better for Jennifer than Rosemary. Furthermore, evidence that she can care for one child at a time does not prove she could care for all three children at once.

■ Finally, contrary to parents' contention, the court did not abuse its discretion in excluding testimony by Rosemary's sister, Wilma, and the mothers of both parents. Based on the offer of proof, the court was correct that this testimony would have been merely cumulative to previous testimony that Mother's care of Jennifer was adequate. Although it is true that the parents' relatives constituted an extended family, they were also a closed, private family all with their own problems, which brings into question their own ability to care for these minors. Mother's sister was married to father's brother. At the beginning of these proceedings, they all lived in the same converted motel. The children of Mother's sister and father's brother were simultaneously before the juvenile court for similar reasons as here. While they all visited frequently, according to Mother, they had never made any negative comments about her care of Albert and Rosemary. The implication is that they observed the baby Rosemary's original starvation but took no effective steps to intervene. Thus, the court could easily have concluded that these relatives would have nothing meaningful to add to the hearing.

## IV

### DID THE COURT ERRONEOUSLY FAIL TO NOTIFY APPELLANTS OF THE POSSIBILITY OF TERMINATION OF PARENTAL RIGHTS AT THE REVIEW HEARING?

Mother contends that the trial court's order should be reversed because the trial judge failed to notify the parents at the review hearing of the possibility of their losing parental rights over the children as required by section 366.2, subdivision (e). Although the trial judge did in fact fail to notify the parents at the review hearing, that error was harmless because the parents were given adequate notice prior to the review hearing.

Section 366.2, subdivision (e), states in pertinent part, "The court *shall* also inform the parent or guardian that if the minor cannot be returned home by the next review hearing, a proceeding pursuant to Section 232 of the Civil Code may be instituted." (Italics added.) Here, the trial judge failed to make the proper notification to the parents at the review hearing. However, as Mother correctly points out, the use of the word "shall" does not necessarily mean that such a duty is compulsory upon the court.

In *In re Charles B.* (1986) 189 Cal.App.3d 1204 [235 Cal.Rptr. 1], the court held that not all statutory usages of the word "shall" indicate mandatory duties, the failure of which strips the court of its power to proceed. In that case, the trial court dismissed the dependency proceedings of two minors on the sole ground that the children's protective services failed to file and serve a report fourteen days before the hearing as required by section 366.2, subdivision (c). The court first noted: "[T]he consequences for failing to comply with this requirement . . . depends on whether the requirement is directory or mandatory. The Supreme Court explained this distinction this way: ' ". . . the 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]" [Citation.] If the failure to comply with a particular procedural step does not invalidate the action ultimately taken, . . . the procedural requirement is referred to as "directory." If, on the other hand, it is concluded that non-compliance does invalidate subsequent action, the requirement is deemed "mandatory." [Citation.]' [Citation.]" [*In re Charles B., supra,* at p. 1209.)

The court held the "shall" provisions of section 366.2, subdivision (c), to be directory and concluded that "the Legislature did not intend section

366.2, subdivision (c) to be mandatory in the jurisdictional sense." (*In re Charles B., supra,* 189 Cal.App.3d at p. 1210.) The court continued by reasoning as follows: "The statute does not provide a penalty or consequence for noncompliance, nor is there any suggestion the Legislature intended to strip the court of jurisdiction in the event of a delay by the probation officer. [Citation.] . . . A dismissal based solely on the late filing of a progress report, without regard for the best interests of the minors, defeats the purposes behind dependency proceedings.

"In the instant case, the trial court dismissed the dependency petitions for what it termed a 'procedural technicality,' even though it did not believe this decision served the interests of justice. While we do not condone petitioner's failure to comply with section 366.2, subdivision (c), the court's decision placed undue weight on a matter of procedure rather than substance." (*In re Charles B., supra,* 189 Cal.App.3d at pp. 1210-1211, fn. omitted.)

We follow the reasoning used in *In re Charles B.* and hold that the closely related section 366.2, subdivision (e), should be considered directory as well. Section 366.2, subdivision (e) neither provides a penalty for noncompliance nor suggests that the Legislature intended to strip the court of its jurisdiction where the court fails to notify the parents at the review hearing that their parental rights might be terminated. Furthermore, section 202 which sets forth the purposes of the juvenile court law and emphasizes the need to act in the minor's best interest, states that "This chapter shall be liberally construed to carry out these purposes." Reversing the trial court's ruling based solely on the court's failure to notify the parents at the review hearing, especially where the parents have effectively received prior notice, would defeat the purpose of the dependency proceedings by ignoring the best interests of the minors and placing undue weight on procedure rather than substance.

Mother's concern with notice is more appropriately suited for protection by the constitutional right to due process of law. Here, however, while there was not strict compliance with section 366.2, subdivision (e), there is no problem with notice. As pointed out by respondent, the parents received actual notice from the court at the March 3, 1987, dispositional hearing. The parents also received constructive notice from the social worker's report of August 4, 1987, which they reviewed with their counsel prior to the August 10, 1987, review hearing, and presumably from the social worker's report of December 11, 1987. Additionally, the parents failed to allege a lack of notice at any point during the proceedings and have not shown that the court's error in failing to notify them at the review hearing has prejudiced them in any way. Thus, although the trial court did not strictly fulfill

the statutory notification requirement, it substantially complied with the statute and fulfilled any due process requirements through the prior notice to the parents. As such, any error by the trial court should, and will, be deemed harmless.

V

### CAN THE COURT'S ERROR, IF ANY, IN TERMINATING REUNIFICATION WITH THE GRANDPARENTS BE RAISED BY MOTHER?

Mother contends that the court erred in terminating reunification efforts with the grandparents because the grandparents successfully complied with the reunification plan yet were denied the opportunity to directly participate in the permanency planning hearing. Mother's contention is flawed, however, because the grandparents did not have any reunification rights nor did they express any interest in reunifying with the minors.

Sections 361.5, subdivision (a), and 361.2, subdivision (f), establish that in a dependency action grandparents have only visitation rights determined at the discretion of the court. Nothing in the code states that the reunification services are to also include the grandparents. Therefore, the grandparents have no reunification rights with the minors.

The grandparents may have visitation rights with the minors, however, under section 361.2, subdivision (f). Here, the trial court properly addressed the grandparents' visitation rights in the parents' first reunification plan by allowing the grandparents unsupervised visits with the minors if the grandparents met certain conditions imposed by the court.

In the present case, the grandparents never showed any desire to join in any of the proceedings concerning the two children. Nothing in the record shows that they participated in or were present at any of the hearings. Furthermore, the grandparents did not even attempt to appeal the lower court's order. (Cf. *Charles S.* v. *Superior Court* (1985) 168 Cal.App.3d 151 [214 Cal.Rptr. 47].) The grandparents have not shown in any way their willingness or desire to be involved in any plans regarding their grandchildren's future. Therefore, the court did not err in terminating reunification with the grandparents without allowing the grandparents to directly participate in the permanency planning hearing.

## VI

### DID THE COURT ERR IN APPOINTING THE DISTRICT ATTORNEY TO REPRESENT THE MINORS AS INDEPENDENT COUNSEL?

Father contends that the trial court erred in appointing the district attorney as independent counsel to represent the minors.

Father first argues that the minors did not have independent counsel. Relying on *In re Patricia E.* (1985) 174 Cal.App.3d 1 [219 Cal.Rptr. 783], he asserts that where the minors do not have independent counsel, there must be an affirmative showing of the absence of need for independent counsel. Father continues by stating that because no such showing was made, the trial court erred in failing to appoint independent counsel for the minors.

Father's reliance on *In re Patricia E.* is misplaced. In that case, the problem addressed by the court arose from the county counsel's dual representation in the same action of both the petitioning agency and the minor. Here, each counsel represented only one party. The county counsel represented the petitioning agency, the district attorney represented the minors, and the public defender represented the parents. Therefore, *In re Patricia E.* does not apply here and father's first argument fails.

Next, father argues that the court erred in appointing the district attorney as counsel for the minors because of the district attorney's conflict of interests between his role as prosecutor against the parents and as counsel for the minors. Specifically, he argues that the district attorney's past prosecution of the parents must have influenced his view of the children's chances to successfully reunite with their parents. This, it is argued, created a conflict of interests which should have been the cause for removal of the district attorney from this case.

Both statutory and case law appear to contradict father's claims. Section 318, applicable at the time of the hearing, stated as follows: "In any case in which it appears to the court that the minor would benefit from the appointment of counsel, the court shall appoint counsel for the minor. . . . Counsel for the minor may be a county counsel, district attorney, public defender, or other member of the bar, provided that the counsel does not represent another party or county agency whose interests conflict with the minor's." Thus, the appointment of the district attorney was proper as long as the district attorney did not represent another party or county agency whose interests conflicted with the minors'.

Section 318 of the code addresses the conflict-of-interest issue by stating, "The fact that the district attorney represents the minor in a proceeding pursuant to Section 300 as well as conducts a criminal investigation or files a criminal complaint or information arising from the same or reasonably related set of facts as the proceeding pursuant to Section 300 *is not in and of itself a conflict of interest.*" (Italics added.) The court in *People* v. *Superior Court (Martin)* (1979) 98 Cal.App.3d 515 [159 Cal.Rptr. 625] discussed the types of conflicts of interests which might prejudice a prosecutor against the accused and require the prosecutor's removal from the case. The court noted that such conflicts include (a) conflicting personal interests, (b) personal or emotional involvement in the case, (c) intense personal involvement in his public duties, (d) personal as opposed to purely professional involvement, or (e) improper utilization of the criminal proceedings as a vehicle to aid his personal or fiduciary interests. (*Id.* at p. 521.)

In the present case, the district attorney representing the minors also prosecuted the parents for criminal conduct arising out of the circumstances which led to the children being declared dependents. Thus, this case falls squarely under the provisions of section 318, indicating that the district attorney had no conflict of interest per se in representing the minors in the dependency hearing. Furthermore, nothing in the record suggests that the district attorney had any personal interest or involvement in the case or in any other way exhibited the type of conflict which, under *Martin,* would require the removal of the district attorney from this case. Therefore, we find father's second argument to be without merit.

 Father's third argument is that his right to effective representation was prejudicially affected by the ineffectiveness of the district attorney as counsel for the minors. He claims that the district attorney should have further pursued the factual matters concerning the two physical injuries to Albert to ensure that the minor's foster care placement was not detrimental to the child. By failing to do so, so the argument goes, the district attorney left father's role regarding the infliction of the injuries to speculation thereby prejudicing him. However, the record indicates the district attorney successfully fulfilled his role as counsel for the minors.

Section 318, subdivision (d), sets out the duties of the minors' counsel. "The counsel shall be charged in general with the representation of the child's interests. In any case in which the minor is four years of age or older, counsel shall interview the minor to determine the minor's wishes and to assess the minor's well-being. Counsel shall make such further investigations as he or she deems necessary to ascertain the facts, including interviewing of witnesses, and he or she shall examine and cross-examine witnesses in both the adjudicatory and dispositional hearings; he or she may

also introduce and examine his or her own witnesses, make recommendations to the court concerning the child's welfare, and participate further in the proceedings to the degree necessary to adequately represent the child. In addition, the counsel shall investigate the interests of the child beyond the scope of the juvenile proceeding and report to the court other interests of the child that may be protected by other administrative or judicial proceedings. The court shall take whatever appropriate action is necessary to fully protect the interests of the child."

Here, father fails to show that the district attorney did not fulfill his duties as counsel for the minors with regard to the injuries sustained by Albert The district attorney cross-examined the doctor who discovered Albert's, injuries, elicited information regarding the extent of those injuries, and inquired into the potential causes of the injuries. Furthermore, the district attorney made recommendations to the court concerning the children's welfare at the permanency hearing and at previous hearings. Although father contends that the district attorney inadequately represented the children, he fails to show what more the district attorney could have done in his capacity as counsel for the children. Thus, father's third argument fails.

The trial court did not err in appointing the district attorney as counsel for the minors.

## VII

### WAS THE COURT'S ORDER THAT VISITATION BE AT THE DISCRETION OF THE SOCIAL WORKER IMPROPER?

Father contends that the trial court improperly ordered that the monthly visitation rights for the parents be arranged for and supervised at the discretion of the social worker. Not so.

First, father improperly relies on *In re Rada W.* * (Cal.App.) (E004498) for the proposition that a trial court cannot delegate authority to direct visitation to an executive agency like the Tulare County Department of Social Services. On January 5, 1989, the Supreme Court ordered that *In re Rada W.* not be officially published and denied review. (See also *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237 [255 Cal.Rptr. 344], where the appellate court found delegation of some discretion to the social worker appropriate.)

Second, the trial court is not required to order visitation rights for parents where the permanency plan for the minor is adoption. Section 366.25,

subdivision (d)(2), requires that the court must make orders for visitation where the permanency plan is guardianship or long-term foster care. However, no such requirement exists where the permanency plan is adoption. (§ 366.25, subd. (d)(1).) Thus, any visitation order made by the court where the permanency plan is adoption is permissive and an order that the visits be supervised at the discretion of the social worker is proper.

Even if the court were required to order visitation rights to the parents, the trial court did not improperly delegate its supervisory power to the social worker. The court made the order that visitations be monthly and left only the actual detailed arrangements for the times, places, and supervision of these monthly meetings to the discretion of the social worker. Thus, the court did not give the social worker the power to determine the parents' visitation rights, just the power to supervise the parents' visits with the minors.

## DISPOSITION

Let a peremptory writ of mandate issue commanding the trial court set aside its order of August 9, 1988, and to conduct a further hearing to determine whether it is likely the minors, or either of them, can or will be adopted, as required by section 366.25, subdivision (d)(1). If it should determine it is likely that either minor can, or will be adopted, it shall reenter its order of August 9, 1988, nunc pro tunc to that date. Otherwise, the trial court shall make whatever further and different orders as may be appropriate under the circumstances.

Martin, Acting P. J., concurred.

**DIBIASO, J.,** Concurring.—I agree this matter must return to the juvenile court for evidentiary resolution of the question of adoptability. I write separately to express a concern about the retroactive application of Welfare and Institutions Code[1] section 366.25, subdivision (j). Simply put, the conclusion that subdivision (j) is retroactive is not compelled and is pregnant with the potential for injustice to parties not involved in this case.

The arguments in favor of retroactive application are: (1) the Legislature presumably knew the terms of subdivision (i) and passed subdivision (j) with that knowledge; and (2) the state Supreme Court has endorsed retroactive application of subdivision (j) by denying a petition for review in *In re T.M.* (1988) 206 Cal.App.3d 314 [253 Cal.Rptr. 535] (hereafter *T.M.*) on

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

February 16, 1989, and, a week later, dismissing as improvidently granted petitions for review in several cases raising appealability issues.[2]

### 1. *Legislative Intent*

Section 366.25, subdivision (j) was one of the products of Senate Bill No. 1860, 1987-1988 Regular Session (SB 1860). State Senator Presley, the author of SB 1860, viewed the bill in relevant part as clarifying that "permanent plans are not appealable orders." In its original version, SB 1860 did not amend section 366.25 to add subdivision (j). In its first amended version, SB 1860 (as amended Apr. 4, 1988), included the language: "(j) Orders determining a permanent plan are not appealable orders but may be the subject of review by extraordinary writ."

A legislative committee analysis observed during this period: "The phrase 'orders determining a permanent plan' is not clear as to which orders at the permanency planning hearing are not appealable. [¶] In an order at a permanency planning hearing, the court may order long-term foster care for the minor child, order or deny visitation to the parents or guardian, or impose a guardianship and issue letters of guardianship. These are final orders from which an appeal is appropriate. Should not the court orders which are not to be appealable be limited to those orders which require the filing of a petition to terminate parental rights or to establish a guardianship?" (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1860 (1987-1988 Reg. Sess.) as amended June 16, 1988.)

The bill as it pertained to section 366.25, subdivision (j) was subsequently amended in the Assembly, on June 29th, to provide: "(j) *An order by the court that authorizes the termination of parental rights pursuant to Section 232 or that authorizes the initiation of guardianship proceedings is not an appealable order* but may be the subject of review by extraordinary writ." and on August 26th, to provide: "(j) An order by the court that authorizes the *filing of a petition to terminate* parental rights pursuant to Section 232 or that authorizes the initiation of guardianship proceedings is not an appealable order but may be the subject of review by extraordinary writ."

It is this version of the bill which became law. (Stats. 1988, ch. 1075, § 6, No. 4 Deering's Adv. Legis. Service, p. 3877; No. 10 West's Cal. Legis. Service, p. 2585.)

---

[2] The Supreme Court dismissed review of the following cases pursuant to California Rules of Court, rule 29.4(c), by a single order dated February 23, 1989: *In re Julia C.*\* (Cal.App. H001254); *In re Erik R.* (Dec. 4, 1987) E004159 [nonpub. opn.]; *In re Keith W.* (Mar. 21, 1988) E003835 [nonpub. opn.]; *In re Sharon W.*\* (Cal.App. G005219); *In re Alexis C.* (May 24, 1988) D006038 [nonpub. opn.]; *In re Christopher C.*\* (Cal.App. A036356); *In re Jenny C.* (May 26, 1988) B029475 [nonpub. opn.].

\*Reporter's Note: Opinions deleted upon direction of Supreme Court.

The policy of the law is firmly against retroactive deprivation of the right of appeal. The legislative will to do so in any particular instance must be "clear." (*Martin* v. *Municipal Court* (1983) 148 Cal.App.3d 693, 696 [196 Cal.Rptr. 218].) That case, cited by *T.M.*,[3] actually enforced the policy which disfavors retroactivity. As the court in *Martin* realized, cutting off the right of appeal by retrospective application of a statute "obviously works great hardship and apparent injustice upon those who may have waived other remedies allowed by law for the correction of possible errors. Third, therefore, *unless the act itself clearly indicates an intention* that it shall have a retroactive or retrospective effect, the rule of statutory construction that such statutes are not to be construed as intended to apply retroactively so as to affect pending appeals is fully recognized and well established by the decisions of this state. Fourth, *it is well settled that in order that such changes in the law as the termination of appellate jurisdiction may affect pending appeals the amending law must either expressly so declare or an implication that such was the intention of the lawmaking power must be definite and clear.*" (*Jones* v. *Summers* (1930) 105 Cal.App. 51, 54-55 [286 P. 1093], italics added.)

Applying the principles summarized in *Jones,* subdivision (j) and its legislative history neither expressly nor by implication declare the Legislature's intent to affect pending appeals. Although the Legislature ultimately came down on the side of nonappealability, the history of the statute does not reflect an attitude that subdivision (j) simply confirmed existing law which some appellate courts had misinterpreted. Rather, as the legislative materials acknowledge: "Existing statutory law does not specify whether or not such orders are appealable and the various courts of appeal have been inconsistent in determining appealability of permanent plan orders which recommend that parental rights be terminated and require the county to file a complaint seeking termination of parental rights under Civil Code Section 232." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1860 (1987-1988 Reg. Sess.) as amended June 16, 1988.)

Had the Legislature considered this to be an area of judicial misinterpretation of clear legislative intent, arguably it would have rectified the situation by expressly applying the new law to every pending case. However, missing from the legislative history is any indication that the Legislature found such judicial error. Likewise missing from the legislative history is any indication the Legislature even thought about retroactivity in enacting subdivision (j).

On the other hand, the Legislature had a specific, easily ascertainable purpose in mind when it added subdivision (i) as part of a major overhaul of

---

[3] Notably, the *T.M.* panel also issued *Martin*.

California's laws pertaining to, among other things, juvenile court dependency proceedings. A Senate Select Committee had convened a task force to examine existing statutes and practices and recommend changes necessary to protect children at risk of abuse, neglect, and exploitation. The results of the task force's work were contained in Senate Bill No. 243 (SB 243) (Stats. 1987, ch. 1485). (Sen. Select Com. on Children & Youth/SB 1195 Task Force, at p. i.)

Included in the legislative package was the promulgation of a new section 366.26, effective January 1, 1989: "SB 243 substantially modifies the procedure for permanently severing parental rights in cases where the child is a dependent of the court. The new procedure will apply to minors adjudicated dependents of the court on or after January 1, 1989. Unlike current practice, which requires the filing and prosecution of a separate civil court action pursuant to Civil Code Section 232, all termination proceedings for children who are dependents will be heard in the juvenile court, as part of the regular review process. The task force reasoned that by eliminating the need to file the separate Civil Code Section 232 action, minors who are adoptable will no longer have to wait months and often years for the opportunity to be placed with an appropriate family on a permanent basis.

"Under the new provisions, a juvenile court must hold a 'permanency' hearing within 120 days of the time it decides that no further reunification services shall be provided to the parents. The procedures are specified in . . . Section 366.26. . . ." (Sen. Select Com. on Children & Youth/SB 1195 Task Force, at p. 10.)

Section 366.26 combined into one the hearings on permanency planning and parental rights termination. Subdivision (a) of section 366.26 provides, in pertinent part: "This section applies to minors who are adjudged dependent children of the juvenile court pursuant to subdivision (c) of Section 360 on or after January 1, 1989." Thus, the contemporaneous addition of subdivision (i) to section 366.25 clarified that the old procedure still applied to minors adjudged dependents before January 1, 1989. In effect, subdivision (i) was an antiretroactivity provision.

It is abundantly clear from the legislative materials that subdivision (i) was part of a larger legislative scheme aimed at speeding up and elucidating certain aspects of dependency proceedings. Because the Legislature *at the same time* enacted a new procedure destined to become effective January 1, 1989 (§ 366.26), it is not surprising the lawmakers underscored, by way of subdivision (i), that the old statutory scheme, applicable before January 1, 1989, was distinct from the new procedures. Two years *later,* subdivision (j)

came along in response to a dispute among the Courts of Appeal about the unrelated topic of appealability.

*T.M.* took the position that subdivision (j) manifests a legislative intent in favor of retroactivity by virtue of the legislators' assumed knowledge, when subdivision (j) was enacted, of the existence of subdivision (i). No doubt it is a legal presumption that the Legislature has in mind existing laws when it passes a statute (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874]; *Estate of Simpson* (1954) 43 Cal.2d 594, 600 [275 P.2d 467, 47 A.L.R.2d 991]; *People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380]). However, in view of the known *antiretroactive* purpose of subdivision (i), to say no appeals will lie after January 1, 1989, in cases where permanency hearings were held before that date, is not also to say with certainty and clarity that the Legislature desired all perfected appeals pending on January 1, 1989, to be peremptorily dismissed. Had the Legislature inserted subdivision (j) before subdivision (i) and then re-alphabetized the two provisions, the rationale adopted by *T.M.* might have somewhat more force.

The "amending law," subdivision (j), does not "expressly declare" an intention "that it shall have a retroactive or retrospective effect." (*Jones* v. *Summers, supra,* 105 Cal.App. at pp. 54-55.) Instead, it is altogether silent on the topic. Moreover, neither the statute nor its legislative history "clearly indicates an intention" to moot out pending appeals. Instead, again, silence prevails. On the other hand, the legislative history of subdivision (i), the provision relied upon to accord retroactive effect to subdivision (j), unmistakably discloses it to be a statute with an antiretrospective purpose wholly unrelated to any issue about appealability. *Jones* would therefore seem to demand that subdivision (j) not be held to be retroactive. Were that the case, subdivision (j) would nonetheless have meaning in those cases where a permanency planning hearing for a child declared a dependent *before* January 1, 1989, is conducted *after* January 1, 1989.

### 2. *State Supreme Court Action*

It has been argued the state Supreme Court endorsed retroactive application of subdivision (j) by denying review in *T.M.* and shortly thereafter dismissing, as improvidently granted, petitions for review in several cases raising appealability issues. The Third District was recently persuaded by this argument in *In re Eli F.* (1989) 212 Cal.App.3d 228 at pages 234-235 [260 Cal.Rptr. 453]: "While the denial of review by the Supreme Court does not normally add weight to the opinion of the District Court of Appeal 'it does not follow that such denial is without significance . . . .' (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 178 [18 Cal.Rptr. 369, 367

P.2d 865]; see 9 Witkin, Cal. Procedure [(3d ed. 1985)] Appeal, §§ 775-776, pp. 743-747.) Given the wholesale disposition of these cases in the face of an appellate interpretation of the new statute, we believe the Supreme Court has made its unspoken views clear. Section 366.25, subdivision (j) resolves the split of authority among the District Courts of Appeal and terminates existing appeals from the orders described in the statute. (*In re T.M., supra,* [(1988)] 206 Cal.App.3d [314] at p. 316 [253 Cal.Rptr. 535].)"

The analysis in *Eli F.* is nothing more than speculation in the absence of some explanation by the Supreme Court for its dismissal of the petitions. It is just as likely the court exercised its prerogative under California Rules of Court, rule 29.4(c), because it realized, with the passage of section 366.26, a decision on appealability would not have any long-lasting effect. Moreover, given the crushing case load faced by the high court, it may well have concluded its work would have been pointless; by the time it issued an opinion on the matter, section 366.25 permanency planning hearings would for all practical purposes be a thing of the past.

As *Jones* recognized, retroactive elimination of an appeal "works great hardship and apparent injustice upon those who may have waived other remedies allowed by law for the correction of possible errors." (*Jones* v. *Summers, supra,* 105 Cal.App. at pp. 54-55.) The potential for hardship and injustice is present here, for this court's decision in *Joshua S., supra,* 186 Cal.App.3d 147, permitting appeals such as this, has undoubtedly been relied upon by lawyers and parties in our appellate district. Having held subdivision (j) to be retroactive, this court may now dismiss[4] all like appeals—including this case—presently pending, even though the appellants, in undoubted reliance on *In re Joshua S.,* elected to proceed by way of the appeal we approved and not by way of writ.[5] *En masse* dismissal, however, raises practical problems to the extent issues other than those disposed of by subdivision (j) are included among the appellate questions. As an alternative, this court may separately dismiss each subdivision (j) appeal as it comes up on our panel calendars. In either instance, the "bounced-out" appellants will have been denied all review of their claims, a result which I am confident the Legislature, whatever else it may have had in mind, did not desire.

The remaining option is the path this panel has chosen to take, that is, the assessment of each case, as it appears on the regular appeals calendar of a panel of this court, in order to decide whether it may be treated as a petition

[4] The court must of its own motion dismiss an appeal from a nonappealable order. (*Efron* v. *Kalmanovitz* (1960) 185 Cal.App.2d 149, 152 [8 Cal.Rptr. 107].)

[5] Writ review was likely not then available because of the existence of the adequate remedy of appeal.

for a writ. If each panel to which the issue is hereafter presented adopts our approach, perhaps all the appellants in the pending appeals will ultimately secure the review they seek. Yet this panel does not control the actions or decisions of subsequent panels of this court and, for a variety of reasons, some, perhaps many, cases will not secure alternate consideration as a writ petition. The appellants in those instances will be denied review despite their previous, wholly justified, reliance upon *In re Joshua S., supra,* 186 Cal.App.3d 147, Even if it turns out that a small number, or only one, of the pending appeals is refused writ treatment and therefore turned away, a patent injustice—from which I trust I have distanced myself by this concurrence—will have been done.

The worry I express here may well be, as I expect my brethren believe, "much ado about nothing." Admittedly, if the rationale of this opinion is uniformly applied to all subdivision (j) cases pending before this court as of December 31, 1988, that is, the record is considered to be a "writ" but the substantive issues are brought up and processed and resolved on their merits in the same manner as an appeal, my fretting will have been unnecessary. After all, "a rose by any other name . . . ."