Filed 6/29/16  S.W. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| S.W., et al.,<br><br>      Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>      Respondent;<br><br>MARIN COUNTY HEALTH AND HUMAN SERVICES et al.,<br><br>      Real Parties in Interest. | A147823<br><br>(Marin County Super. Ct. No. JV26076A) |

S.W. (father) and C.A. (mother) challenge the juvenile court's order terminating reunification services after six months and setting a hearing under Welfare and Institutions Code section 366.26.[1]  (See Cal. Rules of Court, rule 8.450(a).)  Specifically, father challenges the court's findings that he was provided with reasonable services and failed to make substantial progress in his case plan.  Mother similarly challenges the court's finding she failed to make substantial progress in her case plan, and also contends the court erred in failing to make findings on the probability of R.W.'s return to her care and by decreasing her visitation with R.W.  We conclude the court did not err and substantial evidence supports the challenged findings.

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

## BACKGROUND

On February 2, 2015, the Marin County Health and Human Services Department (Department) received a call from mother reporting she was unable to care for R.W. (born in December 2014) or provide for his needs due to a deterioration in her mental health.  Mother stated she needed psychiatric help, was feeling " 'crazy in [her] head,' hypersensitive, and angry at people," and felt overwhelmed.  She was not currently on any medications, but in the past has been diagnosed with Anxiety, Depression, Bipolar Disorder and ADHD.  Mother acknowledged she is an alcoholic.

That same day, the Department received another report of domestic violence between the parents that occurred on Christmas Day 2014.  Father and mother had been drinking, and an argument escalated to the point they threw beer bottles and pushed and hit one another.  Police arrested father for choking mother, who was too drunk to feed R.W.  Maternal grandmother came to the apartment and took R.W. into her care.  It was also reported that another incident took place on January 31, 2015, during which the parents started arguing and father threatened to hit mother while she was holding R.W.  Mother went to maternal grandmother's home but later returned to the apartment, leaving R.W. in the grandmother's care.

On February 3, 2015, social worker Melanie Schmidt held a family meeting at maternal grandparents' home.  Grandparents expressed concerns about the danger of injury to R.W. due to the small size of parents' apartment and the proximity of the child to domestic violence.  Mother admitted she is an alcoholic and drinks hard alcohol to the point of blacking out.  Mother also acknowledged she needs mental health and substance abuse support.  Mother stated the police reports of domestic violence were true, but did not acknowledge this beforehand for fear father could go to jail.  Mother disclosed "she has seen more escalating violence from [father] since [R.W.] has been born."  He verbally abuses her on a daily basis, sometimes grabs her by the wrist or head, and although she loves him, she is afraid of him.

On February 4, 2015, the Department filed a section 300 petition on behalf of R.W. alleging he was at risk due to mother's mental illness and to domestic violence between the parents.

At the detention hearing on February 9, 2015, the parties submitted on the detention report. The court ordered R.W. detained and placed in the care of maternal grandparents. The court ordered the following services for mother: alcohol and drug testing; substance abuse treatment; parenting education; mental health services; and domestic violence services. As for father, the court ordered parenting education and domestic violence services. It allowed supervised visitation with R.W.

The Department prepared a jurisdiction report in connection with the hearing set for March 16, 2015. The Department reported Mother recognized she needs to be sober and address her mental health issues before she can care for R.W. She admitted she left the confidential domestic violence shelter on February 20 and moved back in with father. After a few nights, she recognized this was a mistake and moved back to the shelter. Father agreed he and mother should live apart. He stated he and mother met in a sober living environment, but he does not have "an issue with drinking" now.

R.W. was then three months old and "extremely vulnerable physically and emotionally." His caregivers put his needs first and were providing an environment that encouraged his development, ensured his safety and was free of violence. Parents continued to struggle with the consequences of their volatile behavior toward one another and had not followed through with services. Mother needed to address her alcoholism and mental health issues and father needed to address his anger and alcohol use.

On March 16, 2015, the court continued the jurisdiction hearing to address father's request for a restraining order against mother. The court issued a verbal order that mother stay 100 yards away from father and his apartment except to collect her clothing and effects.

On March 23, 2015, the court assumed jurisdiction without objection on an amended petition filed the same date and appointed a special advocate for the child. The court also granted the Department discretion to place R.W. with mother at a residential

3

drug/alcohol treatment program on 72 hours' notice to the child's counsel, and continued the matter to April 27 for a disposition and restraining order hearing.

In a report prepared for the disposition hearing, the Department recommended the court declare R.W. a dependent of the court, offer family reunification services to parents and affirm the Department's case plan. The Department reported that R.W. was still in the home of his maternal grandparents. Grandparents advised that when R.W. was initially placed with them he frequently was startled by any loud noise, but this reaction has dissipated over the past two months. They now felt R.W. was bonded to them and they were bonding more with him each day. They advised R.W. has "an extremely pleasant disposition[,] likes to laugh and is a pleasure to care for." Also, they reported R.W. was healthy and on track developmentally.

Parents each had the opportunity for supervised visitation with R.W. up to three times per week for a total of 4.5 hours per week. Mother had nine visits with R.W. at the residential treatment house and missed 14 other possible visits. During visits, mother was engaged and cared appropriately for R.W. The reasons mother missed visits included illness and scheduling conflicts with other appointments. Given the scheduling conflicts, the Department had instructed mother to telephone by 9.00 a.m. on the day of a planned visit to ensure she would be present. Subsequently, she missed multiple visits because she did not call on time. Further, mother left the residential program on April 11, and the Department was unable to reach her until she called on April 22 to inform it she was now at the Helen Vine Detox Center and wished to schedule a visit with R.W. on April 27.

Father had eight visits with R.W. at a Department office and also missed 14 other possible visits. During visits, father was engaged and provided R.W. appropriate care. He missed visits because his work schedule changed weekly. Father informed the Department on March 30 he was starting a new, full-time job (8:00 a.m. to 6.30 p.m.) and requested weekend visitation. The Department was assessing whether weekend visitation could be provided under the supervision of R.W.'s caregivers.

4

The disposition hearing was continued for a settlement conference requested by father's counsel. Following the settlement conference, the Department filed a first addendum to its disposition report, stating the parties had reached agreement on the case plan. Under it, mother's responsibilities were to attend "Seeking Safety" classes and demonstrate the strategies learned; continue to work with Marin Adult Mental Health Services and follow directions for medication and treatment; drug test twice a week and stay clean for six weeks; participate in the Alliance In Recovery (AIR) program or attend AA meetings three times a week to support her sobriety. Father's responsibilities were to meet at least once a week with a licensed therapist, focusing on anger management, his role in the domestic violence in his relationship with mother, and appropriate and safe relationships. Also, father had to attend a parenting program focusing on child development and care.

At the hearing, the parties submitted on the disposition reports. The court adjudged R.W. a ward of the court, continued him in out-of-home placement, and adopted the case plan outlined in the Department's addendum report. The court set a sixth-month review hearing for November 30, 2015.

The Department's six-month status report recommended that the court terminate family reunification services and set a selection and implementation hearing. In regard to current family circumstances, the report stated mother had obtained full-time employment as an assistant maintenance worker at a community center and father continued to work in construction.

In mid-August, the parents met with the social worker and told her they were living together again and wanted to reunify with R.W. as a couple. The social worker agreed to parents' "change of heart" and provisionally amended the case plan to allow joint visitation and an opportunity for parents to demonstrate "that they were safe together and with [R.W.]" Maternal grandparents continued to care for R.W., but they had a close relationship with the paternal grandmother, who cared for R.W. on most weekends, during which father visited the infant. At one point, however, paternal grandmother refused father weekend visitation on account of his "attitude" and animosity

5

toward her, and because he spent time constantly texting the mother. Paternal grandmother agreed to resume visitation after father "got it together" and focused on R.W.'s needs during visits.

The social worker also reported that father continued to deny there was domestic violence in his relationship with mother. In particular, during one meeting with the social worker and her supervisor on October 21, 2015, father raised his voice, grew agitated, pointed at the social workers, and declaimed loudly there was no domestic violence in his relationship with mother, saying " 'there never was, I never hit her!' " Mother believed she could safely care for R.W. if reunified with father, and she needed housing to provide a stable environment for the child.

The social worker recommended the court terminate services because parents had not utilized "the 11 months of services they already had to address the necessary changes needed to care for [R.W.]" The social worker opined parents "have used the majority of the time to struggle to take care of themselves, and sadly have not made substantial progress with their case plan and therefore do not have the necessary skills to keep [R.W.] safe."

The Department subsequently filed an addendum reporting parents had located a two-bedroom apartment in Fairfax, and on December 4, 2015, mother requested that a social worker visit the new housing. Before a visit could be arranged, however, mother contacted the social worker to report she was "secretly" leaving father and the new apartment. When father spoke with the social worker on January 22, 2016, he said he was unaware mother was going to leave him and he could not afford the apartment on his own. Father opined he and mother were not " 'super ready to get [R.W.] back but they could prove themselves if they were given more time.' " He and mother " 'are still seeing how things go.' " The addendum stated it "is unclear" why mother decided to leave father, but noted the Department was aware of an incident in November 2015 when police were called to a Novato motel room parents were sharing, due to a "fight" between father and a friend, Max.

The six-month review hearing was held on February 3 and March 3, 2016. In lieu of direct testimony by the case worker from summer 2015 until mid-December 2015, Maria Rosas, the court received into evidence her six-month review report. On cross, Rosas testified she did not know of any reports of domestic violence incidents between parents over the past 10 months. She also confirmed she had been informed by mother's prescribing psychiatric nurse practitioner that mother was compliant with her medication and had been actively engaged in the medication management of her mental health disorder. Rosas further testified on cross that father had attended counseling therapy since June 2015 with two different counselors to address anger management and domestic violence; he had already been referred to Christie Hudson for such therapy when she took over the case in June 2015; he later switched to evening sessions with Ruth Horton to accommodate his work schedule. Horton reported father was participating in a positive way in therapy. Rosas' notes indicated father requested parenting classes in July 2015 and started attending those classes sometime thereafter.

On cross by minor's counsel, Rosas acknowledged one of the issues father was to address in therapy was domestic violence, but he continued to deny domestic violence between himself and mother. Also, father's first therapist Christie Hudson reported father was progressing in June and July but "went backwards" when he reunited with mother in August 2015. Father's relationship with mother was "on and off again." Rosas also acknowledged that father was referred to parenting classes, agreed to attend a parenting program in May 2015, but did not start those classes until October 2015, seven months after the dispositional hearing.

Social worker Erin Lynch supervised the case from detention onwards; she supervised all three social workers who were involved in the case and was involved in the preparation of all the reports filed in the case. Lynch testified to mother's responses to her service objectives and client responsibilities. She opined mother did not meet the service objective of taking appropriate action to avoid being a victim of further domestic violence or her client responsibility of demonstrating strategies to avoid domestic violence. Lynch testified that in June 2015, mother was referred to Seeking Safety, a

7

program targeting domestic violence, but mother did not like the placement and failed to engage in the program. Mother was also referred to the AIR program, but mother never made contact. In short, mother never demonstrated to the Department any strategies she learned with regard to domestic violence.

Lynch further testified that for the most part mother worked with Marin Adult Mental Health Services and followed their recommendations for medication and treatment. Mother also received individual therapy sessions from that organization, but had missed three sessions in the last month. Also, Lynch opined mother failed in her client responsibility on substance abuse testing. Under her case plan, she was required to drug test twice a week, with drug testing to be discontinued if she tested clean for six weeks, but she never tested clean for the required period. Many times mother simply failed to appear for drug testing despite the Department arranging for drug testing on Tuesdays and Wednesdays at mother's request. Also, mother's case plan called for her to attend the AIR program, or alternatively, participate in AA meetings three times per week to support her sobriety. However, mother never participated in the AIR program or provided the Department with any evidence that she attended AA meetings.

Lynch also testified to father's reunification service objectives and client responsibilities under his case plan. She opined father did not meet the case plan requirement to show his ability and willingness to have custody of his child or demonstrate he could provide a stable and peaceful environment for the child. In support of her opinion, Lynch observed that during the reunification period, parents "couch surfed all the time, so we were never able to see a home." In December, parents found an apartment in Fairfax, but they broke up again before the Department social worker could visit the home. Further, during the pendency of the review period, father never indicated to the Department that he was ready and willing to have custody of R.W., and in fact was insistent he could not care for the child on his own and wanted to work with mother to establish a home for the child.

Another service objective for father was that he would take action to avoid being involved in domestic violence and demonstrate to the Department strategies on how to

8

maintain a peaceful environment on behalf of his child. According to Lynch, father did not meet that service objective. In this regard, Lynch stated that although father made some progress in therapy on this issue in the early months, according to his therapist he regressed when he and mother attempted to reunite in August 2015. And whereas father met his responsibility of meeting with a licensed therapist once a week, he had yet to demonstrate to the Department that he could apply what he learned in therapy in caring for R.W., which is critical to the child's safety. The Department was never able to determine whether therapy actually resulted in any modification of father's behavior because parents' living environment was so unstable; parents would not allow the Department social worker home visits because they were "couch surfing" and they never established a "regular consistent environment" where they could care for the child.

Lynch also testified father has always been adamant there was no domestic violence between him and mother, and domestic violence "was not anything that he needed to deal with because he was not convicted of domestic violence." And in regard to father's responsibility to attend a parenting class focusing on child development, Lynch testified the court ordered the program in June 2015 and father did not participate until October 2015. Also, father had yet to demonstrate to the Department that he could apply learned parenting skills in a nonsupervised environment.

Both parents testified at the hearing and also called witnesses on their behalf. Mother testified she has been addressing domestic violence in therapy and learned to deal with situations so they do not escalate and become confrontational. She initially attended the Seeking Safety program, but she stopped going because numbers in the group dropped and she did not think it met her needs. At the start of the case, mother stated she was suicidal, but in March or April 2015 began consulting with Dr. Violet Lakeland. Dr. Lakeland put her on the correct medication, which she only has to take once a month. Since then, mother has been consistent and stable on her medication. On cross, mother stated she has not seen Dr. Lakeland since December 2015 and has started to see a new psychiatrist through Kaiser Permanente, Dr. Monica Caselli, whom she sees roughly once every three weeks.

9

Mother also testified she attended the AIR program for only a short time. She stated the program was unsuitable because it included persons who were "still in their addiction," whereas her alcohol addiction was no longer "an issue now because of the medication." While she had struggled with alcohol abuse when the case first started, she claimed it is no longer a problem now that she is on medication. As for her housing situation, mother was renting a room in Terra Linda, but her longer term plan was to move into Section 8 housing, for which she had just been approved. In regard to her relationship with father, mother stated she intends to stay apart from him because she realizes that if they try to raise R.W. together the "same triggers, the same stresses are going to come up."

Licensed Marriage and Family Therapist Jodi Klugman-Rabb, a contracted vendor with the Department, was called as a witness on mother's behalf. Klugman-Rabb testified that her first session with mother was September 8, 2015; she had 22 sessions scheduled with mother and mother attended 13 of them. Nine sessions were cancelled late, usually an hour before the scheduled time. In addressing domestic violence, the therapy sessions focused on helping mother understand "the pattern of relationships in her past and how it affects her choice in relationships going forward." Klugman-Rabb opined mother had made progress on this issue, and also on the issue of parenting, in which she helped mother identify any "limitations that she has with mental health and relationships and support." She also observed mother had "a strong desire to remain stable" in her mental condition and continued medication. Klugman-Rabb opined mother could meet her case plan objectives—avoiding domestic violence, ability to have custody of her child, and comply with psychological treatment—if she had additional time and services because she had "shown improvement thus far." Nevertheless, Klugman-Rabb stated she was "unclear" about whether mother was committed to making continued progress.

On cross, Klugman-Rabb admitted she had not seen the reports in this case. Also, mother never told Klugman-Rabb she was an alcoholic. Substance abuse is outside of her scope of practice, but Klugman-Rabb acknowledged the possibility of alcoholism

10

should be factored into any opinion about mother's progress toward the ability to parent appropriately. Klugman-Rabb was also unaware mother had been diagnosed with depression and anxiety, and she has never had contact with mother's treating psychiatrist.

Father testified he began therapy with Ruth Horton in August 2015 after spending a few months with Christie Hudson, whom he stopped seeing due to conflict with his work schedule. His case plan goals are recognizing and avoiding dysfunctional relationships, parenting and anger management, and he addresses all these issues in therapy. Specifically in regard to domestic violence, therapy taught him preventative measures, such as separating in order to diffuse a situation, listening to the other person, and showing kindness and understanding. Father testified he is no longer in a relationship with mother; their "on again and off again" relationship finally terminated at the end of 2015. Father testified he participates in a parenting class learning about childhood development and how to "help[] the child learn himself." His first social worker never referred him to a parenting class and only when Maria Rosas took over did he receive a referral to a parenting class.

Father acknowledged he had adamantly denied there had been domestic violence in his relationship with mother. He claimed he had thought domestic violence meant committing a criminal offense and he had not realized it included "arguing and fighting in a verbal manner."

Father called John Mavredakis as a witness. Mavredakis is a senior support service worker for the Department, and beginning in February 2015 he supervised visitation between parents and R.W. during February–March 2015 and again from mid-December 2015 to the time of the hearing. During those times, father visited twice a week and had been consistent in his visits. Father's visits were "check-in visits," where the support worker would check in every 15 to 30 minutes during the visit. Mother's visits are "check-in" also. During the "cross-over time" between visits, when mother was leaving after her visit and father was just arriving, they often chatted about what happened during mother's visit. Their interactions were calm, and Mavredakis never saw them arguing. Mavredakis testified that during visits with R.W., father presented

11

appropriately, greeted the child in an affectionate tone, fed R.W., changed his diapers and played with him.

Father also called Michelle Kemp as a witness. Kemp works for the Family Partnership Program and contracts with the Department in providing classes in positive parenting. Father was a student in her class and enrolled at the beginning of October 2015. The class teaches how to parent in a "democratic" manner, i.e., neither authoritatively or passively, but in a way that "allows a child to grow up with some choice making, learning how to negotiate . . . [and] learn the life s[k]ills as developmentally appropriate." The class also teaches parent-child communication skills. When father first started attending, he was quiet and reserved, and just observed what was going on. As time progressed, he began to participate more, ask questions, and offer his experiences and insight in response to the situations presented. Kemp could not give an example of father demonstrating the communication skills learned in class because "I just see this little piece of an hour and-a-half once a week in my classroom and . . . [¶] . . . he's never had a need to demonstrate anything within the classroom." Kemp stated she could "only go by the questions he asks and how he responds, which is generally very appropriate and positive."

On cross, Kemp testified mother also attended her class and participates conscientiously in the program. Kemp has never observed parents with R.W. Kemp stated it is common that parents participate more in her class over time as they get to know the program and her style of teaching. Kemp has never seen father use the skills taught in class, such as being able to lessen conflict in a high stress situation. Kemp stated her classes start every week and were available June through September 2015 and father could have signed up anytime during that period. Kemp did not know if parents were attending class "as a couple" but they were there at the same time.

After argument by counsel, the juvenile court took the matter under submission. The court announced its ruling at a hearing on March 14, 2016, stating that after reviewing "the evidence and the testimony provided at the hearing, the Court finds it would be a substantial risk and detriment to [R.W.'s] safety and well-being if he's

12

returned to either parent. [¶] While each parent clearly loves [R.W.] and each has made progress, the Court finds clear and convincing evidence that the parents did not participate regularly in the services provided to them and that substantial progress in their respective case plans was not made." The juvenile court set the matter for a selection and implementation hearing and reduced parents' visitation to one visit of 1.5 hours per month.

DISCUSSION

**A.** *Applicable Legal Standards*

Due to the special needs of infants and toddlers for permanency and stability, court-ordered services for children who are younger than three years old, such as R.W., are limited by statute to "six months from the dispositional hearing … but no longer than 12 months from the date the child entered foster care. . . ." (§ 361.5, subd. (a)(1)(B); see also *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1027 (*Fabian L.*) [noting unique developmental needs of infants and toddlers justifies a greater emphasis on establishing permanency and stability early in the dependency process].)

The juvenile court must order return of the child to his parents at the six-month review hearing unless the court finds doing so would create a "substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e).) A parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs" is prima facie evidence return would be detrimental. (*Ibid.*) Additionally, if the court finds by clear and convincing evidence that a parent has not made substantive progress in court-ordered treatment programs, the juvenile court may terminate reunification services and set a section 366.26 hearing. (*Fabian L., supra,* 214 Cal.App.4th at p. 1027.) If, however, the court finds there is a substantial probability the child may be returned to a parent at or before the 12-month permanency hearing, or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency planning hearing. (*Ibid.*)

We review a juvenile court's findings for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th

13

758, 763.)  In doing so, we review the record in the light most favorable to the court's findings and draw all reasonable inferences in support thereof.  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46.)  If the law calls for proof by clear and convincing evidence, the sufficiency of such evidence is primarily a question of fact for the trial court, which we also review for substantial evidence.  (See *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880–881 ["[O]n appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' "].)

Moreover, under substantial evidence review, "an appellate court . . . has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses.  [Citation.]  'Issues of fact and credibility are questions for the trial court.'  [Citations.]"  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 689 [" 'We do not reweigh the evidence or exercise independent judgment, but simply determine whether the record discloses sufficient facts to support the findings . . . .' "].)  With these standards in mind we turn now to address the contentions raised in the parents' writ petitions.

## B.     *Father's Contentions*

Father contends he was not provided with reasonable reunification services. Specifically, he asserts the Department delayed in providing him with therapy and parenting classes, which imposed a significant time delay and negatively affected his ability to succeed on his case plan, citing *In re Maria S.* (2011) 82 Cal.App.4th 1032, 1040–1041 (*Maria S.*) [record contained "no evidence whatsoever" to support the juvenile court's finding that reasonable services had been provided because mother received no services while incarcerated and upon release was "deported before she could avail herself of the services recommended" by the Department].)  In contrast to *Maria S.*,

the record here shows the parties agreed on the case plan, the Department provided services consistent with the case plan, and father availed himself of those services.

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 [observing that in "almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect"].)

Here, substantial evidence supports the court's finding the Department provided reasonable services. The case plan called for father to engage in weekly therapy to address anger management and domestic violence and to attend a parenting program focusing on child development and care. The record shows the Department provided the therapy component of services at or about the time of the disposition hearing on June 1, 2015.[2] In this regard, a letter father introduced into evidence from his therapist Ruth Horton, states he began receiving services on August 5, 2015. Moreover, Horton was the second therapist father consulted. According to father's own testimony, he engaged in therapy sessions for "a few months" with Christie Hudson, then switched from Hudson to Horton to better accommodate his work schedule.

As for the parenting component of father's service plan, father did not begin parenting classes until October 6, 2015, as evidenced in a letter from his parenting instructor, Michelle Kemp. It is also evident that as of the date of Kemp's testimony on February 3, 2016, father was still a student in her class. Thus, father received fully four months of parenting services. The record is less clear as to whether father's delay in starting parenting classes was due to his tardiness in following up on the Department's referral, or due to the Department's tardiness in providing the referral.[3] In any case,

---

[2] Section 361.5, subd. (a)(1)(B) provides that for a child under three years of age on the date of initial removal, "court ordered services shall be provided for a period of six months from the dispositional hearing . . . ."

[3] On the one hand, father claims he went to parenting class as soon as he received the referral. On the other hand, social worker Maria Rosas testified he had been referred to parenting class before she took the case in the summer of 2015, but when she first met

15

because father received fully four months of parenting classes and a full complement of therapy services, we conclude the court's finding that reasonable services were provided is supported by substantial evidence.

Father also contends "[t]he court improperly found no substantial probability of return."[4] However, neither the juvenile court's oral or written orders made any finding on the probability of return. Rather, the court's orders show the court specifically found by clear and convincing evidence that parents failed to make substantive progress in their case plan and, in the exercise of its discretion, set a section 366.26 hearing based on that finding. The court acted entirely in accordance with section 366.21, subdivision (e)(3). Its finding, by clear and convincing evidence, that father failed to make substantive progress in his case plan also foreclosed a finding of a substantial probability of return. (See fn. 4, *ante*.)

Furthermore, the juvenile court's finding as to father's lack of substantive progress in his case plan is supported by substantial evidence. The case plan states R.W. came to the attention of the Department "due to multiple incidents of domestic violence between his parents." Accordingly, father's main responsibility under the case plan was to engage in therapy focusing on his role in the domestic violence and anger management, and to

with him he did not have the information. She later clarified that a case note dated July 30, 2015, indicated father was still awaiting a referral and that a coordinator at SENECA would email him the information. However, father did not begin classes until October 6, 2015, and instructor Kemp testified the parenting class had open enrollment every week. In sum, the record indicates any delay in father starting parenting classes was due to a combination of a possible later referral by the Department followed by father's tardiness in joining the class.

[4] In order to find a substantial probability of return, the juvenile court must make all three of the following findings: (1) the parent consistently and regularly contacted and visited the child; (2) the parent made significant progress in resolving the problems that led to the child's removal from the home; and (3) the parent demonstrated the capacity and ability to complete the objectives of the treatment plan and provide for the child's safety, protection, and physical and emotional well-being. (§ 366.21, subd. (g)(1)(A)–(C), italics added.) Findings (2) and (3) are contrary to the court's finding under section 366.21, subd. (e)(3) that father failed to make substantive progress in his case plan.

16

"demonstrate for the Department the strategies he has learned to ensure he can provide a safe environment for his son." Whereas father consistently engaged in therapy, substantial evidence supports the court's finding it did not result in substantive progress on his issues with domestic violence and anger management.

In this regard, it was only on the day of his testimony at the six-month hearing that father even acknowledged he engaged in domestic violence; he claimed his prior denial of domestic violence was based on a misunderstanding that domestic violence meant he had committed a criminal offense, and he did not realize domestic violence included "arguing and fighting in a verbal manner." Patently, the court did not credit his testimony on this point and we will not disturb that finding on appeal. (See *In re Sheila B., supra,* 19 Cal.App.4th at p. 200 ['Issues of fact and credibility are questions for the trial court.' [Citations.]"].)

Furthermore, father's belated attempt to minimize his domestic violence behavior by characterizing it as "verbal" arguing and fighting is belied by the record. The incidents that led to this dependency proceeding involved physical violence as well as verbal abuse. Such violence included the parents throwing objects at each other, father holding mother down on the couch and choking her until she almost passed out, as well as mother's report of father's "escalating violence" from daily verbal abuse to grabbing her by the wrist and head.

The record also reflects substantial evidence father failed to make substantive progress on his anger management issues. For example, paternal grandmother discontinued father's weekend visitation at one point on account of his "attitude" and animosity toward her. And at a meeting between parents and the social worker and her supervisor, mother terminated the meeting when father began to lose his temper by raising his voice, growing agitated, gesticulating at the social workers, and declaiming there was no domestic violence in his relationship with mother.

In sum, the juvenile court's finding that father failed to make substantive progress in addressing the domestic violence component of his case plan is supported by substantial evidence.[5]

Last, father appears to challenge the juvenile court's termination of services on constitutional grounds. However, father's citation to cases addressing termination of parental rights are inapposite at this stage of the proceedings.

## C. *Mother's Contentions*

Mother similarly contends no substantial evidence supports the juvenile court's finding she had not made substantive progress on her case plan.

One of mother's case plan objectives was to take appropriate action to avoid being a victim of further domestic violence. To that end, and beginning in June 2015, she agreed to attend "Seeking Safety" classes and then demonstrate to the department the strategies she learned in the class, and also to meet regularly with a counselor from the AIR program to address her alcoholism. But, as reported Department's November 2015 status review, mother represented to the social worker in July that she had started Seeking Safety classes, then in August told the social worker the group "dissolved," and when the social worker checked with a Seeking Safety program manager in October about mother's participation, the social worker learned mother had never participated in any classes. Furthermore, Department social worker and case supervisor Erin Lynch testified that the AIR program has a domestic violence component, but mother failed to engage in that program either, claiming "it didn't work out." And according to Lynch, mother has

---

[5] We note that on March 30, 2016, after the court issued its findings and orders, mother filed a request for a restraining order against father, alleging that on March 17, parents got in an argument and father punched mother nine times in the head while grabbing her by the hair. Without deciding whether we are precluded as a matter of law from considering this evidence (see *In re Zeth S.* (2003) 31 Cal.4th 396, 413 [appellate court may not consider "postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights" in order to "*reverse* juvenile court judgments and remand cases for new hearings"], italics added), we do not rely upon it in any event in concluding substantial evidence supports the juvenile court's finding that father did not make substantive progress in his case plan.

18

never demonstrated to the Department any strategies she learned with regard to dealing with domestic violence.

Also, mother's case plan stipulated that if she did not attend the AIR program, then she would participate in AA meetings three times per week to support her sobriety. However, mother never participated in the AIR program or provided the Department any evidence she attended AA meetings. Rather, mother asserted at the six-month hearing that alcohol is no longer a problem for her because she is on medication and has lost the craving for it, despite the fact that when R.W. was removed mother acknowledged she was an alcoholic and drank hard liquor to the point of blacking out. Even mother's family therapist Jodi Klugman-Rabb acknowledged mother had never told her about her alcohol problem and that alcoholism should be factored into any opinion about mother's progress toward the ability to parent appropriately.

Additionally, under the case plan mother agreed to drug test two times per week, to be discontinued if she tested clean for six weeks. Lynch testified mother failed in her client responsibility on substance abuse testing. Many times mother simply failed to appear for drug testing despite the Department arranging for drug testing on Tuesdays and Wednesdays at mother's request. And mother never had a clean drug test, as all the tests were either no-shows or tested positive for marijuana.

In sum, reviewing the record in the light most favorable to the juvenile court's findings and drawing all reasonable inferences in support thereof (*In re Julie M., supra,* 69 Cal.App.4th at p. 46), we conclude substantial evidence supports the juvenile court's finding that mother did not make substantive progress in her case plan.

Mother also contends the juvenile court erred by failing to make a finding under section 366.21, subdivision (e)(3), regarding whether there was a substantial probability R.W. would be returned to her care within six months, and asserts the matter should be remanded for such finding. Even assuming the juvenile court was required to make an express finding on the probability of return, its failure to do so does not require remand because we generally imply such findings where they are supported by substantial evidence. (See *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1825; see also *In re Albert*

19

*B.* (1989) 215 Cal.App.3d 361, 374 [findings on adoptability "need not always be express"]; *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83–84 [implied finding appropriate where substantial evidence supports it].) An implied finding in support of the judgment is certainly warranted here on the question of the probability of return, because, as we noted above in connection with a similar contention by father, the juvenile court's finding by clear and convincing evidence that mother failed to make substantive progress in her case plan foreclosed a finding of a substantial probability of return. (See fn. 4, *ante*.)

Next, mother argues that the court abused its discretion by reducing her visitation with R.W. following termination of services and erred in ordering such reduction in visitation absent a finding of detriment. Mother's argument is without merit.

Prior to termination of services, mother was permitted weekly visitation with R.W. Following termination of services, the court ordered that mother may visit once per month for one-and-a-half hours. "In any case in which the court orders that a hearing pursuant to Section 366.26 shall be held, it shall also order the termination of reunification services to the parent or legal guardian. The court shall continue to permit the parent or legal guardian to visit the child pending the hearing unless it finds that visitation would be detrimental to the child. . . ." (§ 366.21, subd. (h).) Here, the court did continue to permit visitation following termination of reunification services, albeit on a reduced scale. Nothing in section 366.21, subdivision (h) requires the court to make a finding of detriment where it permits visitation to continue.

Moreover, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) And the juvenile court's determination regarding the needs of the child in relation to custody issues is reviewed for clear abuse of discretion. (*Id.* at p. 318 [reviewing court will not disturb a custody determination " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination" ' "].) Here, the court adopted the

Department's recommendation for reduced visitation because the court was informed one-year-old R.W. is very attached to his caregivers, is at an age developmentally where he does not want to be separated from them, and the long 30 to 45 minute drive each way to supervised visitations at the Department offices causes him great distress and to become hysterical when he has to get in the car. Accordingly, the juvenile court's decision to reduce visitation was a rational measure to meet R.W.'s needs for permanency and stability. As such, the court's decision was not an abuse of its discretion. (*Id.* at pp. 317–318)

## DISPOSITION

Father's and mother's petitions for extraordinary relief are denied on the merits and the juvenile court's order setting a section 366.26 permanency hearing is affirmed. This decision is final in this court upon filing. (See Cal. Rules of Court, rules 8.452(i) & 8.490(b)(2)(A).)

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Margulies, J.

A147823, *S.W. v. Superior Court of Marin County*